The Missouri, Kansas & Texas Railway Company
v. Charles Haber *et al.*

No. 10003.

1. Diseased Cattle—*Act of Congress.* The act of congress of
May 29, 1884, entitled "An act for the establishment of a bureau
of animal industry to prevent the exportation of diseased cattle,
and to provide means for the suppression and extirpation of
pleuropneumonia and other contagious diseases among domestic
animals," does not in any manner repeal or nullify the various
acts of the legislature of this state designed to protect domestic
cattle against the introduction and communication of Texas,
splenic, or Spanish fever.

2. ———— *Construction of Statutes.* There is no conflict between
either the act of congress above mentioned, or the rules and regu-
lations established by the secretary of agriculture thereunder, and
the laws of this state which prohibit the bringing into the state
of cattle capable of communicating, or liable to impart Texas,
splenic, or Spanish fever. The act of congress, the regulations
prescribed by the secretary, and the statutes of this state are all
intended to operate concurrently, and to prevent the spread of in-
fectious and contagious diseases among domestic animals.

3. Action for Damages—*Parties.* All persons injured by the
shipping or driving into this state of cattle capable of communi-
cating Texas, splenic, or Spanish fever, may be joined as defend-
ants in an action against the owner of the cattle communicating
such disease, for the purpose of recovering damages for the in-
juries so sustained, and to subject such cattle to the lien for such
damages created by the statute; and in such action the defend-
ants sustaining such injuries and entitled to a lien on the same
cattle, may set up their causes of action and obtain judgments
thereon, and the liens of all persons entitled to recover against
the owner of the cattle may be adjusted in one action.

4. Railroad Company, *May be Made a Defendant.* A railroad
company, acting in conjunction with the owner of cattle com-
municating such disease in bringing them into this state, may also
be joined as a defendant in such action, and all questions affect-
ing its liability, not only to the plaintiff, but to each of the defend-
ants, may be determined in the case.

*Error from Lyon District Court.*

Charles Haber, as plaintiff, brought suit in the
district court of Chase county against E. A. Hosier

and George D. Hosier, partners as Hosier Bros., The Missouri, Kansas & Texas Railway Company, Francis Brogan, W. J. Brogan, and Joseph N. Brogan, partners as Brogan & Sons, and numerous other parties defendant, alleging that the plaintiff resided in Lyon county, and there kept and owned 49 head of healthy native cattle; that Hosier Bros. owned and kept in the state of Texas 2,300 head of wild, undomesticated Texas cattle, capable of communicating Texas, splenic, or Spanish fever to the native cattle of Kansas; that between April 1 and July 15, 1892, the defendants, Hosier Bros., The Missouri, Kansas & Texas Railway Company, and Brogan & Sons transported, drove and brought said Texas cattle from a point in Texas south of the thirty-seventh parallel of north latitude into the state of Kansas, in violation of the act of the legislature of Kansas entitled "An act for the protection of cattle against contagious diseases," and acts amendatory thereof and supplementary thereto; that said cattle were transported to Hartford, Lyon county, Kansas, and thence driven through Lyon county into Chase county, along the highway, and upon the range and pasture where plaintiff's cattle were kept; that the defendants before named had knowledge and information that said Texas cattle were capable of imparting said disease to the domestic cattle of this state; that they did communicate said disease to plaintiff's cattle, and thereby caused them to sicken and die, to his damage $2,500. A great number of other persons, who had also had cattle die from Texas fever imparted by the same herd of cattle, were joined as defendants. The petition alleges that the Texas cattle had been quarantined, and afterward placed in possession of a receiver, who held them with the consent of all parties in interest.

They were afterward sold by the receiver, and at the time of filing the amended petition he held the proceeds derived from the sale. The plaintiff claimed a lien on the funds in his hands for the amount of his loss, and asked judgment against Hosier Bros., the railway company, and Brogan & Sons for the amount of his damages, that it be adjudged a lien on the funds in the receiver's hands, and be satisfied out of the same. The other defendants are alleged to claim an interest in said fund because of losses of cattle sustained by them from the same cause. The defendants who had lost cattle from the same cause answered separately, stating a cause of action substantially similar to that of the plaintiff, and asking satisfaction of their claims out of the moneys in the hands of the receiver, and for judgment against the same parties. The railway company moved the court to require the plaintiff to make his petition more definite and certain by stating specifically what interest, if any, or connection with said cattle the railway company had except that of a common carrier, and, second, by stating what, if any, interest, lien or claim upon the funds in the hands of the receiver the railway company had. This motion was overruled.

The railway company then answered, alleging, in substance, that it was incorporated under the laws of Kansas, and engaged in the business of a common carrier of freight and passengers between different states; that it connected at Denison, Tex., with the Missouri, Kansas & Texas Railway Company of Texas, a different corporation, and that said last-named railroad connected at Taylor, Tex., with the road of the Texas & Pacific Railway Company, another corporation, operating a line of railroad extending westward from Fort Worth through the town of Midland; that

on April 26, 1892, Hosier Bros. entered into a written contract with the Texas & Pacific Railway Company to transport for them 744 head of cattle from Midland, Tex., to Hartford, Kan., and on the next day made a further contract for like transportation of 644 more; that on June 10, 1892, said Hosier Bros. made a further contract with the said company for the transportation of 485 other cattle from and to the same places; that all of said cattle were loaded into the cars at Midland, Tex., furnished by the Texas & Pacific Railway Company; that there is no other railroad running into Hartford, Kan., except that of the defendant; that the defendant received said cattle at Denison, Tex., as a connecting carrier, in the same cars in which they were first loaded, and delivered the same to Hosier Bros. at their destination, as named in the contract with the Texas & Pacific Railway Company. It denied that it had anything whatever to do with driving the cattle from Hartford to the Brogan pasture in Chase county, and alleged that, on February 26, 1892, the secretary of the department of agriculture issued and served upon all the railroad companies of the United States, including the defendant company, his regulations concerning cattle transportation, a copy of which was attached to the answer; that the circular letter establishing such regulations was issued in accordance with section 7 of the act of congress of May 9, 1884, entitled "An act for the establishment of a bureau of animal industry to prevent the exportation of diseased cattle, and to provide means for the suppression and extirpation of pleuropneumonia and other contagious diseases among domestic animals," and that said rules and regulations removed all restrictions from the transportation of cattle to and from any portion of the United States, except that

portion described in said regulations as the area in which the disease known as splenic or southern fever exists among cattle; that Midland, Tex., the point from which said cattle were shipped, lies outside of the infected district as designated by the secretary of agriculture, and that said cattle had been kept in Pecos county since the 1st of December, 1891, and had not been east or south of the government quarantine line; that before said cattle were received by the defendant company, one Albert Dean, live-stock inspector of the bureau of animal industry, acting under the authority of the department of agriculture of the United States, and also under the state board of live-stock sanitary commissioners of Kansas, issued to Hosier Bros. permits for the shipment of said cattle; that it had no notice or knowledge that said cattle were infected with Texas or splenic fever, or would communicate said disease, and that because of its relation to the public as a common carrier it was bound to receive and transport said cattle.

There is no conflict in the testimony as to the essential facts. Hosier Bros. owned a large ranch in Pecos county, Tex., bordering on the Pecos river. The headquarters of the ranch, which was about 40 miles square, was on Independence creek, about six miles from the river. On this ranch they had a great number of cattle, which ranged freely over the country, and sometimes crossed the river into Crockett and Val Verde counties. The quarantine line established by the secretary of agriculture, as shown by the map and circular letter, runs along the Pecos river, and on the east line of Pecos county. Midland, the station at which the cattle were loaded, is outside of the boundaries of the infected district as designated by the secretary; but the line of the Texas

& Pacific railroad crosses into the infected district a short distance east from Midland, and the whole route over which the cattle were shipped, thence to the south line of Kansas, is included in the infected district. Although bills of lading in the usual form were issued by the Texas & Pacific Railway Company, the contract for the shipment of the cattle was made by E. A. Hosier with the agents of the Missouri, Kansas & Texas Railway Company at Kansas City, Mo., at a rate below the usual rate. The business was sought after by the agents of the company. They were informed that the cattle were being shipped from Texas to Kansas for the purpose of being pastured in a large pasture owned by Brogan in Chase county; that it was distant about 20 miles from Hartford; that it would be necessary to drive the cattle across the country from Hartford in order to reach the pasture; that the pasture was much nearer to Bazar, a station on the Atchison, Topeka & Santa Fe railroad, than to Hartford, and in order to secure the business a rate of $10 less per car was made on the shipment. A contract for pasturing the cattle had been made by the Hosiers with the Brogans, under which the Brogans agreed to receive the cattle either at Hartford, Olpe, or Bazar. It was claimed on the trial, by Brogan, that the railway company agreed to pay him for driving the cattle from Hartford to his ranch in consideration of his aiding the company in securing the shipment over its road instead of the Santa Fe. The cattle were shipped as stated in the pleadings, were received by the Hosiers at Hartford, and driven under the directions of Brogan thence to his Chase county ranch. In July, cattle along the route over which they were driven began to show symptoms

of Texas fever, and thereafter great numbers of them died. A number of separate actions were brought in Chase and Lyon counties, which were all consolidated, and by stipulation the whole matter was removed to Lyon county, and the case of the plaintiff and of all cross-petitioning defendants against the railway company alone was tried together, the action as against Hosier Bros. and Brogan & Sons having been continued to a subsequent term. The jury brought in verdicts in favor of the plaintiff and also of all cross-petitioning defendants, and on these verdicts judgments were rendered in favor of the plaintiff for $1,173, and in favor of 145 defendants against the company in amounts ranging from $12 to $19,325.08.

Answers to special questions submitted at the request of the railroad company were also returned, among which are the following:

"1. Did the railroad company have any actual notice that these cattle, or any of them, were from the infected district of Texas? Ans. No."

"3. Did any of the agents, servants or employees of the railroad company having charge of the handling of the trains in which these cattle were carried have any information or knowledge concerning Texas or splenetic fever? A. We do not know."

"8. Did not Hosier Bros. send two men with each train of cattle, and was it not the duty of such men to look after and care for the cattle. A. Yes.

"9. Did the trainmen or employees of the defendant in charge of the trains have anything to do with the handling of the cattle, or with the loading or unloading of them? A. No.

"10. Was it not the duty of the trainmen in charge of the train in which the Hosier Bros.' cattle were shipped to simply look after the management and operation of the train? A. Yes.

"11. Is it not a fact that all the information given

to the railroad company by Hosier Bros. and by Francis Brogan was to the effect that said cattle were from Pecos county, Texas. A. Yes.

"12. Is it not a fact that by the rules and regulations of the Hon. Jeremiah M. Rusk, secretary of the department of agriculture, establishing a quarantine line, Pecos county, Texas, was entirely west and outside of said line? A. Yes, we suppose so."

"15. Is it not a fact that cattle from north and west of the government quarantine line are not supposed by the bureau of animal industry to be inoculated with germs of Texas fever, and are supposed to be incapable of communicating it to native cattle? A. Yes, that is the supposition."

"26. Is it not a fact that the railroad company delivered the cattle to Hosier Bros. at Hartford, and until after such delivery no Texas fever was communicated by them, and no damage done to the plaintiff or any of the claimants suing under their cross-petitions? A. Yes.

"27. If you find that the cattle communicated Texas fever, is it not a fact that such fever was communicated by the drive across the country from Hartford to the Brogan pasture in Chase county, and the placing of the cattle in such pasture? A. Yes."

"29. Is it not a fact that Hosier Bros., the owners of the cattle, by their agents, the Brogans, drove the cattle from Hartford to the Brogan pasture? A. Yes, it is alleged so."

Motions were made by the railway company for judgment in its favor on the special findings of the jury, and also for a new trial, both of which were overruled. The railway company brings the case to this court for review. The opinion herein was filed April 11, 1896.

*T. N. Sedgwick*, and *L. B. Kellogg*, for plaintiff in error.

*J. J. Buck*, *E. W. Cunningham*, and *Madden Bros.*, for defendants in error.

*Eugene Hagan*, and *Madden Bros.*, for defendants in error Farrington and Lantry.

The opinion of the court was delivered by

ALLEN, J. :  I.  The main contention of counsel for the plaintiff in error is that this was an interstate shipment of cattle ; that the company's connection with the whole matter was that only of a common carrier ; that it complied with all the regulations prescribed by the department of agriculture under the act of congress ; that the federal statute and the regulations established by the secretary of agriculture under it is the supreme law, and in effect repeals all provisions of the laws of Kansas in any manner conflicting therewith ; that the company was bound, as a carrier, to receive and transport the cattle because they were loaded at a point without the quarantine line established by the secretary, and the shippers were furnished with a permit issued in accordance with the regulations governing such shipments ; that it delivered them to the owners at their destination ; that no injury resulted to any one from the cattle while in the railroad company's charge ; and that no culpable conduct on its part is shown to have contributed to the plaintiff's loss.   The conclusions we have reached render it unnecessary to consider how far congress, by acts passed for the regulation of interstate commerce, could go in curtailing the power of the legislature of this state to protect its citizens from the introduction of infectious or contagious diseases dangerous to their health or destructive of their property. The first question to consider is whether there is really any conflict between the act of congress and the state statute on which the plaintiff's cause of action is based.

Section 3 of chapter 201 of the Laws of 1891 reads as follows :

"Any person or persons who shall drive, ship, or transport, or cause to be shipped, driven, or transported, into or through any county in this state, any cattle liable or capable of communicating Texas, splenic, or Spanish fever to any domestic cattle of this state, shall be liable to any person or persons injured thereby for all damages that they may sustain by reason of the communication of said disease, or Texas, splenic, or Spanish fever, to be recovered in a civil action in any court of competent jurisdiction, and the parties so injured shall have a first and prior lien to all other liens for such damages on the cattle communicating the disease of Texas, splenic, or Spanish fever."

By the fourth section of the same chapter it is provided that proof that the cattle were brought into this state from the south of the thirty-seventh parallel of north latitude shall be taken as *prima facie* evidence that such cattle were, between the 1st day of February and the 1st day of December of the year in which the offense was committed, capable of communicating Texas, splenic, or Spanish fever, and that the owner or person in charge of such cattle had full knowledge thereof. It is further provided in the last-mentioned section that if it is shown that the cattle have been kept since the 1st day of December of the previous year west of the twenty-second meridian of longitude from Washington and north of the thirty-fourth parallel of north latitude, the provisions of the section shall not apply. Section 3, above quoted, contains, in substance, the provisions of section 7, chapter 161, of the Laws of 1881, which by its terms includes only persons driving or causing to be driven such cattle into or through a county in this state, while section 3

includes persons shipping or transporting, as well as driving, such cattle. In March, 1884, an act was passed by the legislature of the state entitled "An act for the protection of domestic animals," which provided for the appointment of a live-stock sanitary commission, and was designed to prevent the spread of contagious disease among domestic animals within the state. On May 29 of the same year the act of congress entitled "An act for the establishment of a bureau of animal industry to prevent the exportation of diseased cattle, and to provide means for the suppression and extirpation of pleuropneumonia and other contagious diseases among domestic animals," took effect, and appears as chapter 60, volume 23, U. S. Statutes at Large. The only sections of the act we deem it necessary to quote are as follows:

"Sec. 3. That it shall be the duty of the commissioner of agriculture to prepare such rules and regulations as he may deem necessary for the speedy and effectual suppression and extirpation of said diseases, and to certify such rules and regulations to the executive authority of each state and territory, and invite said authorities to co-operate in the execution and enforcement of this act. Whenever the plans and methods of the commissioner of agriculture shall be accepted by any state or territory in which pleuropneumonia or other contagious, infectious or communicable disease is declared to exist, or such state or territory shall have adopted plans and methods for the suppression and extirpation of said diseases, and such plans and methods shall be accepted by the commissioner of agriculture, and whenever the governor of a state, or other properly constituted authorities, signify their readiness to co-operate for the extinction of any contagious, infectious or communicable disease in conformity with the provisions of this act, the commissioner of agriculture is hereby authorized to expend so much of the money appropriated by this act as may

be necessary in such investigations, and in such disinfection and quarantine measures as may be necessary to prevent the spread of the disease from one state or territory into another."

"SEC. 6. That no railroad company within the United States, or the owners or masters of any steam or sailing or other vessel or boat, shall receive for transportation or transport, from one state or territory to another, or from any state into the District of Columbia, or from the district into any state, any live stock affected with any contagious, infectious or communicable disease, and especially the disease known as pleuropneumonia; nor shall any person, company or corporation deliver for such transportation to any railroad company, or master or owner of any boat or vessel, any live stock, knowing them to be affected with any contagious, infectious or communicable disease; nor shall any person, company or corporation drive on foot or transport in private conveyance from one state or territory to another, or from any state into the District of Columbia, or from the district into any state, any live stock, knowing them to be affected with any contagious, infectious or communicable disease, and especially the disease known as pleuropneumonia: *Provided*, That the so-called splenetic or Texas fever shall not be considered a contagious, infectious or communicable disease within the meaning of sections 4, 5, 6 and 7 of this act as to cattle being transported by rail to market for slaughter, when the same are unloaded only to be fed and watered in lots on the way thereto."

"SEC. 7. That it shall be the duty of the commissioner of agriculture to notify, in writing, the proper officials or agents of any railroad, steamboat or other transportation company doing business in or through any infected locality, and by publication in such newspapers as he may select, of the existence of said contagion; and any person or persons operating any such railroad, or master or owner of any boat or vessel, or owner or custodian of or person having control over such cattle or other live stock within such in-

45—56 KAS.

fected district, who shall knowingly violate the provisions of section 6 of this act, shall be guilty of a misdemeanor, and, upon conviction, shall be punished by a fine of not less than $100 nor more than $5,000, or by imprisonment for not more than one year, or by both such fine and imprisonment.''

It is clearly appears from section 3, above quoted, that congress did not cast on the secretary of agriculture and those acting under him the entire responsibility of preventing the spread of contagious diseases among domestic animals. It expressly recognized the right of the states to pass laws and prescribe rules and regulations for that purpose, and authorized the expenditure of the money appropriated by congress for the purposes stated in the act whenever the governor of a state or other properly constituted authorities signified their readiness to co-operate with the department of agriculture. Not only is there an absence of permission to transport domestic animals capable of communicating an infectious or contagious disease from one place to another under any authority whatever, with a single exception hereafter mentioned, but the first clause of section 6 expressly prohibits any railroad company from transporting from one state or territory to another any live stock affected with any communicable disease. The last clause of this section expressly recognizes the existence of such a disease as splenetic or Texas fever, but exempts cattle affected with it from the provisions of the act when being transported by rail to market for slaughter, when the same are unloaded only for the purpose of feeding and watering on the way. The grant of permission to transport to market for slaughter emphasizes the prohibition contained in the preceding portion of the section against the transportation

for other purposes of cattle capable of communicating the disease. It clearly was not the purpose of congress to authorize cattle capable of imparting Texas fever to be brought into Kansas and communicate the disease to the domestic herds of this state. On the other hand, this section explicitly prohibits the company from doing so. Section 7 makes it the duty of the commissioner of agriculture to give notice to railroad companies doing business through any infected locality of the existence of the contagion, and imposes penalties for the violation of the act. This requirement of notice does not abrogate any of the other provisions of the act. Nor does it in any manner affect the validity of the laws of this state on the subject. It seems entirely clear to us that, in the passage of this act, congress exercised its power to regulate commerce between the states in aid of the states in their efforts to prevent the spread of diseases among domestic animals, and to assure purchasers of animals exported from this country for slaughter of their healthful condition. There is nothing whatever in the act prohibiting the states from enacting and enforcing regulations to extirpate and prevent the spread of contagious diseases, but, on the contrary, the states are in effect asked to be more active and vigilant in their efforts in that direction. The validity of the statutes of this state passed for the protection of domestic cattle against Texas or splenic fever has been considered by this court and upheld. (*Pattee v. Adams*, 37 Kan. 133; *Mo. Pac. Rly. Co. v. Finley*, 38 id. 550.)

The case of *Railway Co. v. Hefley*, 158 U. S. 98, so much relied on by counsel for plaintiff in error, does not seem to us to have any bearing. It relates to a statute of Texas on the subject of freight rates, and is entirely foreign to the question now under considera-

tion. The case of *Railroad Co. v. Husen*, 95 U. S. 465, also cited, has more bearing. It holds a law of Missouri absolutely prohibiting the bringing into the state of Texas, of Mexican or Indian cattle between the 1st day of March and the 1st day of November in each year, unless kept in the state the entire previous winter, to be an unwarranted restriction on interstate commerce, because it does not purport to be a police regulation merely to prevent the introduction of contagious or infectious diseases, but prevents the importation of such cattle, however healthy. It was said in the opinion in that case, in speaking of the power of the state : "It may exclude from its limits convicts, paupers, idiots and lunatics, and persons likely to become a public charge, as well as persons afflicted by contagious or infectious diseases, a right founded, as intimated in the *Passenger Cases*, 7 How. 283, by Mr. Justice Grier, in the sacred law of self-defense. (Vide *Neff v. Pennoyer*, 3 Sawyer, 283.) The same principle, it may also be conceded, would justify the exclusion of property dangerous to the property of citizens of the state ; for example, animals having contagious or infectious diseases." The case of *Kimmish v. Ball*, 129 U. S. 217, is very closely in point. It is there held that

"Section 4059 of the code of Iowa, which provides that a person having in his possession Texas cattle shall be liable for any damages which may accrue from allowing them to run at large, and thereby spread the disease known as the Texas fever, is not in conflict with the commerce clause of the constitution of the United States, nor is it a denial to citizens of other states of any rights and privileges which are accorded to citizens of Iowa, and thus in conflict with subdivision 1 of section 2 of article 4 of the constitution, relating to the privileges and immunities of the citizens of the several states."

Although that case arose after the passage of the act of congress we are now considering, it does not seem to have been contended that there was any conflict between the act of congress and the Iowa statute.   In the opinion it was said :

"The case is therefore reduced to this, whether the state may not provide that whoever permits diseased cattle in his possession to run at large within its limits shall be liable for any damages caused by the spread of the disease occasioned thereby, and upon that we do not entertain the slightest doubt.   Our answer, therefore, to the first question upon which the judges below differed is in the negative, that the section in question is not unconstitutional by reason of any conflict with the commercial clause of the constitution."

II.  It is insisted that, even though the statute be held valid, the facts in this case do not warrant a recovery against the railroad company, because the introduction of the cattle into the state was rather the act of Hosier Bros. than of the company ; that it received the cattle from a connecting carrier, with waybills showing that the cattle were loaded outside of the infected district, and furnished with inspectors' certificates of their healthful condition ; that it delivered them to the owners at the destination named, and had no connection whatever with the drive to the Brogan pasture in Chase county.   The responsibility of a carrier bringing into this state the germs of contagion which destroy the property of great numbers of the citizens of the state is not so easily evaded, or shifted to the shoulders of owners or other persons taking part in the shipment.

Complaint is made of the ruling of the court excluding certain permits, as well as the circular issued by the secretary of agriculture, containing a notice that a disease known as splenic or Southern fever ex-

ists among cattle within the area therein described, and prohibiting the transportation of cattle from said area to any other portion of the United States, except for certain purposes, and under certain regulations therein prescribed, not applicable to this case, and also of the instructions of the court in reference thereto.  The permits referred to were issued by Albert Dean, inspector at Kansas City, Kan., and purport to be by order of the live-stock sanitary commission. One of them authorized the shipment by the defendant to Hartford, Kan., of 1,501 head of cattle consigned to Hosier Bros.  The only description of the cattle contained in it is: "Said cattle are shown by affidavit in this office to have been from Pecos county, Texas.  These cattle are branded t 3, and other brands."  The other is in substantially the same language, authorizing the shipment of 500 head.  It is not necessary to determine what protection a certificate issued by an inspector who had actually inspected the cattle, describing them so that they could be identified, might afford the railroad company or owner of the cattle, in a criminal prosecution or any other action where the matter of good faith on the part of the person acting under the certificate might be in issue. It is not claimed that the inspector had ever seen the cattle, or had any personal knowledge whatever in regard to them.  The permits show that they were based on affidavit, and the description of the cattle given in them is altogether insufficient to identify them.  The circular issued by the secretary of agriculture, which was excluded, contains nothing tending to relieve the company from liability.  So far as showing the boundaries of the infected district, the map issued by the secretary, which was admitted in evidence, answered the same purpose as the circular.

The board of live-stock sanitary commissioners doubtless has power to establish and enforce quarantine regulations within this state.  But such regulations could not have the effect to practically annul chapter 201 of the Laws of 1891, passed seven years after the act creating the live-stock sanitary commission.  The secretary of agriculture could not and had not attempted to defeat or break the force of the act of congress under consideration, but his acts, so far as they are shown by the evidence in the case, have been directed to prevent the spread of the disease, not to facilitate it.

The evidence in the case clearly shows that the representatives of the company were fully informed of the fact that the cattle came from Pecos county, Texas, which is not only south of the south line of Kansas, but south of the thirty-fourth parallel of north latitude.  A glance at the map would have disclosed the fact that Pecos county extends to the boundary of the infected district as designated by the secretary of agriculture, and would also have shown that the boundary marked out by him, which extends east and west along the north boundary of Crockett county, turns when it strikes the Pecos river, and runs south and east, following the course of the river.  The evidence shows that these cattle were kept on a large ranch, having the Pecos river for its boundary; that it was not inclosed with any fence, and that the cattle could and did range across the river into Val Verde and Crockett counties, included in what the secretary recognized as the infected district.  The statutes of this state prohibit the introduction, not of all Texas cattle, as the statute of Missouri did, but of all cattle capable of imparting the Texas or splenic fever, and provide that the fact that such cattle are brought into this

state from south of the thirty-seventh parallel of north latitude between the 1st of February and the 1st of December shall be taken as *prima facie* proof that they are capable of imparting such fever. The cattle were in fact capable of communicating the Texas or splenic fever. They did communicate it. They did spread it so as to infect and destroy great numbers out of the domestic herds in Chase and Lyon counties. The company's agents knew before they made the contract with Hosier Bros. that the cattle were to be driven from Hartford to Brogan's ranch. They brought the infected cattle into the state to the station of Hartford fully cognizant of the purpose of Hosier Bros. and the Brogans, and did knowingly aid them in carrying out that purpose. They are responsible for all the direct consequences that have ensued therefrom. They acted, not only in direct violation of the statutes, which have been found by long and bitter experience to be so essential to the protection of the domestic cattle of this state, but they acted in direct violation of section 6 of the act of congress before quoted. The regulations established by the secretary of agriculture contain nothing tending to exempt the company from liability, and the secretary had no power under the act of congress to make any regulations which would have the effect to abrogate in any degree the statutes of this state. The permits offered in evidence afford no protection to the company, and the court did not err in excluding them. The evidence shows that ticks, which are regarded as a strong, if not absolutely certain, indication that the cattle are capable of communicating the disease, were plainly and easily discernible on many of the cattle; that they were visible to the naked eye, and were seen by witnesses who observed the cattle at Fort Worth and

at Parsons.    Even if this were an action at common law for negligently spreading the disease, in view of the now generally known fact that the disease of Texas of splenic fever may be communicated to the domestic cattle of Kansas by Texas cattle, and of the legislation in this and neighboring states, and by congress, recognizing the existence of the disease, a very strong case is made by the testimony against the company.

We find no inconsistency between the special findings and general verdict of the jury.    We think the instructions were eminently fair, if not even more favorable than the law is, toward the railroad company.    They were told in the fourth instruction that they must find from the evidence that Texas cattle were brought into the state by the defendant; that the cattle of the plaintiff and the cross-petitioning defendants became infected by the disease imparted to them by such Texas cattle, and that such disease was Texas, splenic, or Spanish fever, and " that the officers, employees or agents of the railway company defendant had knowledge that such Texas cattle transported by it to this state were liable to impart such disease to the native cattle of this state, or that they ought, by the exercise of diligence and care, to have known of the dangerous character of these cattle, and that they would or were liable to impart said disease to the native cattle of this state."    There is nothing in the instructions conflicting with the portion of the charge above quoted.    Under this, no harsh rule requiring the company to act at its peril with reference to the shipment was declared, but the jury were told that it would only be liable in case its representatives failed to exercise care and diligence to ascertain whether the cattle were liable to impart the disease or not. Though presented by counsel in various forms, what

we have said in disposing of the main contention also answers the substance of the various claims with reference to the merits of the case.

III.  A question of practice which at first may seem serious is presented by the record.  The suit was brought against Hosier Bros., Brogan & Sons, and the railway company, against all of whom a recovery was sought as joint wrong-doers, acting in concert in bringing in the cattle in violation of the statute.  It is alleged that the cattle belonged to Hosier Bros., and the plaintiff claimed a lien on them under the provisions of the statute.  One hundred and forty-five parties defendant, who had also suffered loss from the same cause, and who also claimed a lien on the same cattle for their damages, were joined as parties defendant.  They answered setting up causes of action against the same parties on the same grounds, and in all respects similar to the cause of action stated in the plaintiff's petition.  The plaintiff's case and the cross-demands of all these defendants who claimed affirmative relief were tried together, and 146 different verdicts were rendered against the railway company by the same jury.  It is contended that this could not lawfully be done.  There was no demurrer by the railway company on the ground of a misjoinder of causes of action, nor was there any request for a separate jury to try the issues between the railroad company and each cross-petitioning defendant.  The question was raised by motion to dismiss the petition and also the cross-petitions, on the ground that there was an excess of parties, and objections were interposed to the evidence on the same ground.  Section 36 of the code provides.:

"Any person may be made a defendant who has or claims an interest in the controversy adverse to the

plaintiff, or who is a necessary party to a complete determination or settlement of the question involved therein.''

Section 83 provides : '' The plaintiff may unite several causes of action in the same petition, whether they be such as have heretofore been denominated legal or equitable, or both, where they all arise out of either one of the following classes : *First*. The same transaction or transactions connected with the same subject of action. . . . *Third*. Injuries, with or without force, to person and property, or either. . . . But the causes of action so united must all belong to one of these classes, and must affect all the parties to the action, except in actions to enforce mortgages or other liens.''

Section 3 of chapter 201 of the Laws of 1891 gives to the parties injured by reason of the communication of Texas, splenic, or Spanish fever a lien for their damages on the cattle which have communicated it. This lien was concurrent as to all of the parties who sought to recover in this case. Neither one had a right to assert his lien to the exclusion of any other. It is impossible to perceive how the rights of the parties to satisfy their claims out of the proceeds of the cattle could have been properly determined, or how, in the language of section 36 above quoted, there could have been a complete determination or settlement of the questions involved, without the presence as parties of all persons entitled to a lien. If only two persons had suffered loss, the determination of their respective rights in one action would not seem a very remarkable practice. It is only because of the very great number of parties interested in this case that the question is made to appear so serious. The principle applicable, however, is the same whether there be two claimants or 200. The right of the plaintiff to join all against whom a recovery is sought does not seem

to be seriously questioned, and does not admit of doubt. We think there was no error in the rulings of the court upon these matters. The case of *Harsh v. Morgan*, 1 Kan. 293, and *Palmer v. Waddell*, 22 id. 352, and other cases cited by counsel, do not appear to us to have any application to the question before us.

Complaint is also made of the manner of preparing and receiving the verdicts. Under the circumstances of this case, and in the absence of any demand for separate trials, we are unable to perceive that there was any error in the course adopted by the court. Among the verdicts returned by the jury there was one in favor of J. W. Ketchem for $391. After the jury had been discharged for the term, the attorney for Ketchem moved to correct the verdict in his favor by adding $417 thereto, which, it is claimed, was shown to be due him by a special finding of the jury, in addition to the amount allowed in the general verdict. On his application, the foreman of the jury was brought into court and permitted to sign the special finding and an amended verdict for $808, and on this amended verdict judgment was rendered in his favor against the railway company. There is nothing in the record brought to this court showing that this special finding was returned with the other special findings. The signature of the man who had been foreman of the jury, after they were all discharged for the term, with or without leave of the court, could not make a verdict, nor supply a substantial defect in one. If the special finding had been duly returned into court it would control the general verdict. Whether it is absolutely indispensable that answers to special questions should be signed by the foreman we need not now determine, for we are of the opinion that the record fails to show that the special finding

was returned by the jury at all. It follows, therefore, that the judgment in favor of Ketchem must be modified to $391, the amount allowed by the general verdict of the jury. In all other respects the judgment is affirmed.

All the Justices concurring.