### [No. 4431.]

### REID V. THE PEOPLE.

*1.* ANIMALS—BRINGING INTO STATE—INSPECTION—STATUTORY CONSTRUCTION.

Section 2, page 335, Session Laws 1885 (Mills Ann. Stat. §4288), making it unlawful to bring into this state between the first days of April and November any cattle or horses from south of the 36th degree parallel of north latitude unless they have been held at some place north of said parallel for at least 90 days prior to their importation, or unless a certificate or bill of health be procured from the state veterinary sanitary board and requiring the owner to pay the expense of any inspection of such stock, is not in conflict with the act of congress known as the animal industry act, approved May 29, 1884, or the rules and regulations thereunder prescribed by the secretary of agriculture.

*2.* SAME.

The opinion and advice of the chief inspector of the national bureau of animal industry, to the effect that it was incompetent for a state to charge and collect inspection fees for animals brought into the state is not binding on the courts and is no defense to a prosecution for violating the provisions of section 2, page 335, Session Laws, 1885.

*3.* SAME.

A certificate or bill of health issued by an agent of the national bureau of animal industry does not do away with the necessity of its holder to obtain a certificate from the state veterinary board before bringing cattle into the state from south of the 36th degree parallel of north latitude.

4. Same—Constitutional Law—Inter-state Commerce—Equal Privileges of Citizens—Imposts.

Section 2, page 335, Session Laws 1885 (Mills Ann. Stat. §4288), is not in violation of the constitution of the United States article 8, section 1, subdivision 3, conferring upon congress power to regulate inter-state commerce; nor of article 4, section 2, subdivision 1, guaranteeing equal privileges of the citizens of the several states; nor is the inspection fee prescribed by said act in any sense an impost tax or duty within the meaning of article 1, section 10, subivision 2.

*Error to the District Court of Arapahoe County.*

Messrs. Talbot, Denison & Wadley, for plaintiff in error.

Mr. C. C. Post, attorney general for the people.

Chief Justice Campbell delivered the opinion of the court.

The plaintiff in error (defendant below) was convicted and sentenced to the county jail for six months for violating the provisions of section 2 of an act of the general assembly of Colorado entitled "An act to prevent the introduction of any infectious or contagious disease among the cattle and horses of this state," approved March 21, 1885, Session Laws 1885, 335. It reads:

"It shall be unlawful for any person, association or corporation to bring or drive, or cause to be brought or driven, into this state, between the first day of April and the first day of November, any cattle or horses from a state, territory or county south of the 36th deg. parallel of north latitude, unless said cattle or horses have been held at some place north of the said parallel of latitude for a period of at least ninety days prior to their importation into this state, or unless the person, association or corporation owning or having charge of such cattle or horses, shall

procure from the state veterinary sanitary board a certificate, or bill of health, to the effect that said cattle or horses are free from all infectious or contagious diseases, and have not been exposed, at any time within ninety days prior thereto, to any of said diseases. The expense of any inspection connected herewith to be paid by the owner or owners of such cattle or horses."

There is no dispute about the facts. The defendant, as charged in the information, on the 20th of June, 1901, caused to be brought into the county of Arapahoe and state of Colorado 882 head of cattle from the counties of Lubbock and Cochran, in the state of Texas, which are south of the so-called quarantine line fixed by the act, without having held the cattle at some place north of said line for a period of at least ninety days prior to their importation into this state, and also without having procured from any officer or agent of the state veterinary sanitary board of the state of Colorado a certificate, or bill of health, such as is contemplated by the statute.

The sole question is one of law, and that is, whether this act, or more accurately speaking, the section upon which the information is founded, is in violation of subdivision 3 of section 8 of article 1,—the commercial clause,—or of subdivision 1 of section 2 of article 4,—equal privilege of citizens clause,—or of subdivision 2 of section 10 of article 1,—the import duty clause,—of the constitution of the United States, or of the animal industry act of congress, approved May 29, 1884, and the rules and regulations thereunder prescribed by the secretary of agriculture.

Not the only object of the act of congress referred to, yet unquestionably one of its chief aims, is the

.extirpation of pleuro-pneumonia and other conta-
gious, infectious and communicable diseases of cattle.
By section 3 it is made the duty of the secretary of
agriculture to prepare such rules and regulations as
he deems necessary for the speedy and effectual
accomplishment of that general object. But neither
exclusive regulation of the subject matter is assumed
by congress, nor entire responsibility for the enforce-
ment of the act cast upon the secretary. Upon the
contrary, he was expressly directed to certify such
rules and regulations to the executive authorities of
each state and territory, and invite them to co-operate
in the execution of the act.

Section 6 prohibits absolutely the transportation by
rail or boat from one state or territory to another of
any live stock affected with any contagious, infec-
tious or communicable disease, and especially the
disease known as pleuro-pneumonia, and all persons
are prohibited from transporting by private convey-
ance or driving on foot from one state or territory to
another state or territory any live stock, knowing
them to be affected with any such disease; but there
is a proviso that splenetic or Texas fever shall not
be considered as within the prohibition of the act as
to cattle being transported by rail to market for
slaughter, when the same are unloaded only to be
fed and watered in lots on the way thereto. Supp. to
U. S., Rev. Stats. vol. 1, p. 435.

On the 10th of December, 1900, the secretary of.
agriculture, acting under the delegation of power
thus conferred, promulgated rules and regulations
concerning the transportation of cattle, and therein
notified all transportation companies and stock own-
ers and others interested that a contagious and infec-
tious disease known as splenetic fever existed among

cattle in a certain area in the United States, which includes the counties of Lubbock and Cochran in the state of Texas. Clause 3 of these regulations provides that from and after January 1, 1901, no cattle shall be transported from the area south of the federal quarantine line therein fixed to any portion of the United States north or above the same, except as therein allowed. However, it permits the transportation by rail or boat only of cattle for immediate slaughter, and not otherwise, upon full compliance by the shipper with the specific rules governing the same.

On May 4, 1901, the state veterinary sanitary board of Colorado proclaimed substantially the same regulations, adopted the same quarantine line, and required a certificate or bill of health from a state inspector before it was lawful to ship cattle through, or import them into, this state. And on the 6th of May the governor of Colorado, upon representation of the board that contagious or infectious diseases existed in the places specified in the order of the secretary of agriculture, issued his proclamation prohibiting the importation into the state of cattle from such affected localities, without obtaining a certificate from the state board of a bill of health.

The regulations of the secretary, as does the act under which they were issued, expressly recognize that the different states and territories might establish the same, or a different, quarantine line, and that appropriate legislation of the different states and territories of the Union might be passed to enforce within their respective boundaries the federal regutions as well as their own, provided the latter were satisfactory to the secretary of agriculture, and not in conflict with those prescribed by the national au-

thority. It was further contemplated that if a quar-
antine line should be adopted by any state different
from that established under the act of congress, a
modification of the latter might be had, if the secre-
tary deemed it advisable.

On the 18th of June, 1901, when these cattle were
shipped, the foregoing regulations of the two gov-
ernments were in force. The defendant then ob-
tained from the local inspector of the bureau of ani-
mal industry at Hereford, Texas, apparently the point
of shipment, a certificate that the stock were free
from all infectious and contagious disease, and that
no Texas fever infection was known to exist where
they had been kept, or on the trail over which they
passed. Attached to this certificate and below the
officer's signature, was a statement that animals
which had been inspected and certified, as these were,
by an inspector of the United States bureau of ani-
mal industry as free from disease, have the right to
go into any state without further inspection, or the
exaction of additional fees for the same.

When, two days later, they reached the south
boundary line of Colorado, the cattle were inspected
by an agent of the state veterinary board of Colo-
rado—against protest of plaintiff in error—but no
certificate was furnished to him, because he declined
to pay the fee charged to cover the cost of inspec-
tion which was required by the specific regulations of
the board.

Neither in the act of congress nor in the rules of
the secretary of agriculture is the sweep, extent or
limit defined of certificates issued by the bureau of
animal industry. But it appears from a letter in the
record written by the chief inspector of the national
bureau to one of his subordinates that it was incom-

petent for a state to charge or collect inspection fees because the same constituted a regulation of interstate commerce, and the efficacy of a certificate of inspection given by one of its officers made unnecessary a certificate from the state authorities. While, of course, due consideration must be given to this interpretation, which the chief inspector says is his conclusion from decisions of the federal. supreme court, yet that interpretation is not binding upon the courts till that supreme authority puts the stamp of its approval upon it.

It is the contention of plaintiff in error, as to which the attorney general takes issue, that our statute is a regulation of inter-state commerce, because the state inspection fee and the delay in transit incident to such inspection necessarily operate as a burden upon that commerce. And while he is disposed to concede that, in the absence of action by congress, the state statute might stand, yet since, as he insists, congress has taken upon itself the entire responsibility of suppressing diseases among domestic live stock, the congressional act, in which authority over the subject matter is exercised, constitutes a regulation of inter-state commerce, and therefore state legislation covering the same matter must give way.

To our minds it is clear that the plain intention of congress was that the national and state governments should work together in preventing the spread of communicable diseases among domestic live stock, and that neither act is, nor was it intended to be, a regulation of inter-state commerce, except possibly indirectly, but primarily each is merely a quarantine or inspection law.

For the purposes of this opinion it may be conceded that, if congress should assume to itself exclu-

sive jurisdiction over the subjects of quarantine and inspection, and, in pursuance of that design, should pass a general law intended to apply uniformly throughout all portions of the United States and to supplant all state statutes upon the same subject, state laws having the same object in view must give way,—at least, so far as there is any inconsistency between them. But where congress has not assumed to itself complete control, and especially where it has invited the aid and co-operation of the states, regulations prescribed both by it and the states may be enforced, at least so far as they harmonize, and compliance with both must be made, though the subject matter of the legislation be precisely the same.

Unquestionably, quarantine and inspection laws of a state having for their object the health of its citizens, or the prevention or suppression of disease among its domestic live stock, is within the province of state legislation. It comes within the scope of the general police power which the states have never surrendered. While it is true that, under the guise of exerting its police power, the state may not go beyond what is necessary for the protection of its citizens and their property, or to such length as to interfere with, or obstruct, legislation of congress calculated to regulate inter-state commerce, or infringe upon any of the sovereign powers entrusted to congress, yet, if it keeps within the scope of its authority and prescribes regulations which are reasonably necessary to further the legitimate object aimed at, its acts may be upheld.

The fee for inspecting cattle prescribed by the state veterinary board is only sufficient to cover the cost of inspection and no greater, and the regulations

which have been made by the officials of the state
are such only as are reasonably necessary to prevent
the dissemination of infectious and contagious dis-
eases among domestic live stock.  The certificate or
bill of health, issued by the agent of the bureau of
animal industry at Hereford, Texas, did not do away
with the necessity of its holder to obtain the certifi-
cate from the officer of our state veterinary board be-
fore he brought his cattle into this state.   Hereford
is several hundred miles from the Colorado border,
and two days elapsed after obtaining the certificate
there before the cattle reached that line.   It may
be that these cattle in the  meantime had passed
through infected districts, or had become affected
with some infectious or contagious disease.   But we
do not place our decision that our law is valid on
what has been done under it.   The practical and
necessary operation of the act in its enforcement ac-
cording to its provisions furnishes the true test; that
is,    what    may    be,    not    what    has    been,    done
under it.   The requirement that a certificate should
be    obtained    from    our    veterinary    board    was
clearly  authorized   by   the   act   of   congress   and
the regulations of the secretary of agriculture.   In
neither was there any declaration that the state
might not exact it, and it would be practically impos-
sible for the state to co-operate with the national
authorities in the enforcement of the act of congress
without prescribing some such regulations as these.
Indeed, it would be difficult to conceive of any effect-
ive co-operation on the part of the state except in
some such way as our executive authorities have
adopted; and power to them to assist the federal
authorities can be conferred only by the general as-
sembly.

The precise question before us has not been decided by the supreme court of the United States, but upon principle we think it is clear that the section of our act in question and the regulations made in pursuance thereof are in entire harmony with national legislation, and not in conflict with any provision of the federal constitution. Plaintiff in error cites a number of cases in support of his contention, some of which we proceed briefly to consider.

In *Gulf, Colo. &c. Ry. v. Hefley*, 158 U. S. 98, it was held that when a federal and a state statute operate on the same subject matter, and prescribe different rules concerning it, and the federal statute is one within the competency of congress to enact, the state statute must give way. That does not apply here, if for no other reason than that not different but the same rules have been prescribed by both.

A case strongly relied on is *R. R. Co. v. Husen*, 95 U. S. 465. But that was a case wherein it was held that a statute of Missouri which, under the guise of a quarantine regulation, absolutely prohibited between the first day of March and the first day of November in each year, the driving or conveying of any Texas, Mexican or Indian cattle into the state, whether diseased or not, is not a legitimate exercise of the police power of the state, but that it was clearly a regulation of interstate commerce which it was not competent for the legislature of Missouri to make. And the same is true of the Minnesota statute condemned in *Minnesota v. Barber*, 136 U. S. 313, which virtually prohibited the sale in Minnesota of meats for human food unless the animals were slaughtered in that state.

The following cases, we think, in principle, will sustain the validity of our legislation; *Grimes v. Eddy*, 126

Mo. 168; *M. K. & T. Ry. Co. v. Haber*, 56 Kan. 694; S. C. 169 U. S. 613. Speaking with reference to the Kansas statute similar to ours, the supreme court of the United States in the case last cited says that even if the subject matter of such regulations be one that may be taken under the exclusive control of congress, and be reached by national legislation, any action taken by the state upon that subject that does not directly interfere with rights secured by the constitution of the United States, or by some valid act of congress, must be respected until congress intervenes.

Applying this test to our statute, it is manifest that, even assuming that quarantine and inspection laws may be within the exclusive province of congress when it chooses to assert its authority, still there is no interference by our act with rights secured by the constitution of the United States or by some valid act of congress; that congress itself has not assumed to itself the exclusive control, but has expressly invited the states to co-operate. *Kimmish v. Ball*, 129 U. S. 217; *Patapsco Guano Co. v. North Carolina*, 171 U. S. 345; Tiedeman's State and Federal Control of Persons and Property, vol. 2, 1042 *et seq.*

The questions involved here being such as entitle the plaintiff in error to be heard by the supreme court of the United States, we have not deemed it advisable further to prolong the discussion, or to consider at greater length its decisions upon analogous questions. The conclusion which we have reached we think is sound in principle and clearly deducible from the decisions of that august tribunal. In a petition for a writ of *habeas corpus* before Mr. Justice Hallett, United States district judge for the district of Colorado, wherein the plaintiff in error here sought to be discharged from imprisonment

under the sentence imposed in this case, the learned judge denied the writ upon the ground that our statute was valid and that the federal and state acts were merely supplemental quarantine or inspection laws, both of which might be enforced within the same territory, and that there must be a compliance with both of them.

Our law does not regulate inter-state commerce in the sense of that term prohibited by the federal constitution. At most it only indirectly affects it. The equal privileges of the citizens of the several states and territories are not infringed by it, and the inspection fee prescribed by the act is not in any sense an impost, tax or duty, but merely covers the actual cost of an inspection, which is the usual and ordinary method adopted to protect the property of the ciizens of the states.

Our conclusion is that the judgment is right, and it is accordingly affirmed.

*Affirmed.*