# GULF, COLORADO AND SANTA FÉ RAILWAY COMPANY *v.* HEFLEY.

ERROR TO THE COUNTY COURT OF MILAM COUNTY, STATE OF TEXAS.

No. 255. Submitted April 4, 1895. — Decided April 29, 1895.

The Texas statute of May 6, 1882, making it unlawful for a railroad company in that State to charge and collect a greater sum for transporting freight than is specified in the bill of lading, is, when applied to freight transported into the State from a place without it, in conflict with the provision in section 6 of the Interstate Commerce Act of February 4, 1887, c. 104, 24 Stat. 379, as amended by the act of March 2, 1889, c. 382, 25 Stat. 855, that it shall be unlawful for such carrier to charge and collect a greater or less compensation for the transportation of the property than is specified in the published schedule of rates provided for by the act, and in force at the time ; and, being thus in conflict, it is not applicable to interstate shipments.

When a state statute and a Federal statute operate upon the same subject matter, and prescribe different rules concerning it, and the Federal statute is one within the competency of Congress to enact, the state statute must give way.

ON May 6, 1882, the legislature of the State of Texas passed the following act:

"SEC. 1. *Be it enacted by the legislature of the State of Texas,* That it shall be unlawful for any railroad company in this State, its officers, agents or employés, to charge and collect, or to endeavor to charge and collect, from the owner, agent or consignee of any freight, goods, wares and merchandise, of any kind or character whatever, a greater sum for transporting said freight, goods, wares and merchandise than is specified in the bill of lading.

"SEC. 2. That any railroad company, its officers, agents or employés, having possession of any goods, wares and merchandise of any kind or character whatever, shall deliver the same to the owner, his agent or consignee, upon payment of the freight charges, as shown by the bill of lading.

"SEC. 3. That any railroad company, its officers, agents or employés, that shall refuse to deliver to the owner, agent or consignee any freight, goods, wares and merchandise of any kind or character whatever, upon the payment, or tender of payment, of the freight charges due, as shown by the bill of lading, the said railroad company shall be liable in damages to the owner of said freight, goods, wares or merchandise to an amount equal to the amount of the freight charges for every day said freight, goods, wares and merchandise is held after payment, or tender of payment, of the charges due, as shown by the bill of lading, to be recovered in any court of competent jurisdiction." Laws of Texas, extra session, 1882, c. 26, p. 35.

Under that act the defendants in error commenced an action before a justice of the peace in the county of Milam, to recover $82.80. After judgment the case was appealed to the county court of the county. In that court a trial was had, a jury being waived, which resulted in a judgment in favor of the plaintiffs and against the railway company for the full amount

claimed. That was the highest court in the State to which the case could be taken, and thereupon the defendant sued out this writ of error.

The facts appear in the findings made by the trial court, and are as follows: On August 4, 1890, Wolf & Kramer, a firm doing business in St. Louis, Missouri, shipped from that city a carload of furniture to the plaintiffs at Cameron, Texas. The shipment was by the St. Louis and San Francisco Railway Company, and the bill of lading issued by that company named 69 cents per 100 pounds as the rate. At this rate the freight charges amounted to $82.80. On the arrival of the car at Cameron the plaintiffs presented this bill of lading to the agent of the defendant company, together with $82.80, and demanded the furniture. The agent refused to deliver without payment of $100.80, that being the amount of charges due at the rate of 84 cents per 100 pounds. This was the rate named in the printed tariff sheet posted in the railroad office at Cameron. As a matter of fact, before the shipment at St. Louis, the rate had by the companies been reduced to 69 cents, but the new tariff sheet had not reached Cameron, and the agent was ignorant of the reduction. While declining to deliver the goods except upon payment at the rate named in his tariff sheet, he told the plaintiffs that he would telegraph for instructions. He did so, and was advised that the rate had been reduced, and to accept 69 cents, but the telegram was not received at once, and so the furniture was detained one full day. So far as appears, the St. Louis and San Francisco Railway Company was not only a different corporation from the defendant, but under separate management and control, though, as respects through shipments, acting under a joint tariff.

Mr. A. T. Britton, Mr. A. B. Browne, Mr. J. W. Terry, and Mr. George R. Peck for plaintiff in error.

No brief filed for defendants in error.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

The question presented by this record is this : Is the statute of Texas imposing a penalty for a failure to deliver goods on tender of the rate named in a bill of lading applicable to interstate shipments? While the amount in controversy is small, so small, indeed, that the case could not be taken from a lower to the Supreme Court of the State, the question is of no little importance.

At the time of this transaction the act of Congress, known as the Interstate Commerce Act, of February 4, 1887, c. 104, 24 Stat. 379, as amended by the act of March 2, 1889, c. 382, 25 Stat. 855, was in force. By section 6 every common carrier, subject to the provisions of the act, (and all railroads carrying interstate freight are subject to such provisions,) is, for the inspection and information of the public, required to print and publicly post at each station upon its routes the schedules of fares and rates for carriage of passengers and property thereon. No advance in such fares and rates shall be made except after ten days' public notice, such advance to be shown by printing and posting new schedules, or plainly indicated upon the schedules then in force, and duly posted, nor shall any reduction in such fares and rates be made except after three days' previous public notice given in like manner. The section then reads:

" And when any such common carrier shall have established and published its rates, fares, and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares, and charges as may at the time be in force."

After this is a provision in respect to joint rates between connecting carriers. Such carriers are required to file with the Interstate Commerce Commission copies of their joint tariffs, which shall be made public by the carriers when directed by the commission, in so far as in the judgment of the commission it is deemed practicable, the commission being

given power to prescribe the measure of publicity to be given and the places in which the joint tariffs shall be published. There is also a prohibition like to that quoted of any advance of such joint rates except after ten days' notice, or any reduction except after three days' notice, and a like declaration that it shall be unlawful for any common carrier, party to any such joint tariff, to charge, demand, collect, or receive from any person or persons a greater or less compensation than is specified in such schedules. Section 10 makes a violation of these provisions by any carrier, or any agent or person acting for the carrier, a penal offence, subject to fine not exceeding $5000, and, in case the offence amounts to an unlawful discrimination in rates, to imprisonment for a term not exceeding two years, or both such fine and imprisonment.

Clearly the state and the national acts relate to the same subject-matter and prescribe different rules. By the state act the bill of lading is made controlling as to the rate collectible, and a failure to comply with that requirement exposes the delinquent carrier to its penalties, while the national statute ignores the bill of lading and makes the published tariff rate binding, and subjects the offender, both carrier and agent, to severe penalties. The carrier cannot obey one statute without sometimes exposing itself to the penalties prescribed by the other. Take the case before us: If, in disregard of the joint tariff established by the defendant and the St. Louis and San Francisco Railway Company and filed with the Interstate Commerce Commission, the latter company, as a matter of favoritism, had issued this bill of lading at a rate less than the tariff rate, both the defendant company and its agent would, by delivering the goods upon the receipt of only such reduced rate, subject themselves to the penalties of the national law, while, on the other hand, if the tariff rate was insisted upon, then the corporation would become liable for the damages named in the state act. In case of such a conflict the state law must yield. "This Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land." Constitution, Art. VI, clause 2. It is no answer to say that in this

case the defendant might have complied with both the state and the national statute; that it was a party to the reduction of the joint rate; that, therefore, the bill of lading was properly issued at 69 cents per 100 pounds; that it should have promptly notified its agents at every station of such reduction; that if it had done so the agent at Cameron could have complied with the state as well as the national law, and that its negligence in this respect is sufficient ground for holding it amenable to the state law. The question is not whether, in any particular case, operation may be given to both statutes, but whether their enforcement may expose a party to a conflict of duties. It is enough that the two statutes operating upon the same subject-matter prescribe different rules. In such case one must yield, and that one is the state law.

It may be conceded that were there no congressional legislation in respect to the matter, the state act could be held applicable to interstate shipments as a police regulation. *Railroad Company* v. *Fuller*, 17 Wall. 560. In that case a statute of Iowa, requiring each railroad company annually in the month of September to establish passenger and freight rates, and on the first day of October following put up at all the stations on its route a printed copy of such rates and cause it to remain posted during the year, and, providing that, for charging and receiving higher rates than thus posted it should forfeit not less than $100 nor more than $200 to any person injured thereby, was upheld, notwithstanding Congress had passed the act of June 15, 1866, c. 124, 14 Stat. 66, providing "that every railroad company in the United States . . . be and is hereby authorized to carry upon and over its road . . . all passengers . . . freight and property on their way from any State to another State, and to receive compensation therefor;" and a recovery in favor of a party having shipped freight from Illinois into Iowa and charged higher rates of freight than thus posted was sustained. It will be perceived that the two statutes do not conflict, do not prescribe different rules, and only in a very general sense can be said to be in relation to the same subject-matter. It was held that the state statute was simply a police regulation. While so holding,

it was also said that even if it did affect commerce the question would arise whether it did not fall within that class of cases of which several were noticed in the opinion, where an act conceded to be a regulation of interstate commerce, yet local in its character, had been sustained by reason of the absence of congressional legislation in respect thereto. Among the cases named are *Willson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245; *Cooley* v. *Philadelphia Port Wardens*, 12 How. 299; *Pennsylvania* v. *Wheeling &c. Bridge*, 18 How. 421; *Brig James Gray* v. *Ship John Fraser*, 21 How. 184; *Gilman* v. *Philadelphia*, 3 Wall. 713; *Ex parte McNiel*, 13 Wall. 236. Of the same character are the following cases, since decided: *Pound* v. *Turck*, 95 U. S. 459, 462; *Hall* v. *DeCuir*, 95 U. S. 485, 488; *County of Mobile* v. *Kimball*, 102 U. S. 691; *Packet Co.* v. *Catlettsburg*, 105 U. S. 559, 562; *Transportation Co.* v. *Parkersburg*, 107 U. S. 691, 702; *Escanaba Co.* v. *Chicago*, 107 U. S. 678; and *Morgan* v. *Louisiana*, 118 U. S. 455. In this latter case certain quarantine laws of the State of Louisiana were upheld, although to a certain extent they affected commerce with foreign nations, the court saying: "It may be conceded that whenever Congress shall undertake to provide for the commercial cities of the United States a general system of quarantine, or shall confide the execution of the details of such a system to a National Board of Health, or to local boards, as may be found expedient, all state laws on the subject will be abrogated, at least so far as the two are inconsistent."

Generally it may be said in respect to laws of this character that, though resting upon the police power of the State, they must yield whenever Congress, in the exercise of the powers granted to it, legislates upon the precise subject-matter, for that power, like all other reserved powers of the States, is subordinate to those in terms conferred by the Constitution upon the nation. "No urgency for its use can authorize a State to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of Congress by the Constitution." *Henderson* v. *New York*, 92 U. S. 259, 271. "Definitions of the police power must, however, be taken, subject

to the condition that the State cannot, in its exercise, for any purpose whatever, encroach upon the powers of the general government, or rights granted or secured by the supreme law of the land." *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 661. " While it may be a police power in the sense that all provisions for the health, comfort, and security of the citizens are police regulations, and an exercise of the police power, it has been said more than once in this court that, where such powers are so exercised as to come within the domain of Federal authority as defined by the Constitution, the latter must prevail." *Morgan* v. *Louisiana*, 118 U. S. 455, 464.

It is unnecessary to pursue this discussion further. The state statute and the national law operate upon the same subject-matter, and prescribe different rules concerning it. The national law is unquestionably one within the competency of Congress to enact under the power given to regulate commerce between the States. The state statute must, therefore, give way.

The judgment of the county court of Milam County is

*Reversed, and the case remanded to that court for further proceedings not inconsistent with this opinion.*