## N. T. Kirby, Appellee, v. Chicago & Alton Railroad Company, Appellant.

1. COMMON CARRIERS—*burden to show assent of shipper to restrictive conditions of bill of lading.* The rule that where a contract limiting the liability of the carrier is contained in a bill of lading constituting both a receipt and a contract, the burden is upon the carrier to show that the shipper assented to the terms and conditions of the contract, is as applicable in an action of assumpsit to recover damages for the breach of an alleged special contract as in an action of tort to recover damages for negligence.

2. COMMON CARRIERS—*when contract predicated upon published tariff schedules does not arise by implication.* Held, under the facts of this case, that a contract between the shipper and the carrier based upon the rate made by the carrier to the shipper according to the published tariff schedules, did not arise by implication.

3. INTERSTATE COMMERCE—*what does not render contract discriminatory.* A contract of shipment made by a railroad company which contains a provision providiñg for carriage by a particular train or within a particular time, is not discriminatory and void within the meaning of the Interstate Commerce Act; and this rule applies as well to actions arising in contract as to those sounding in tort.

Assumpsit. Appeal from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding. Heard in this court at the May term, 1908. Affirmed. Opinion filed November 24, 1908.

PATTON & PATTON, for appellant; F. S. WINSTON, of counsel.

GRAHAM & GRAHAM and ALBERT SALZENSTEIN, for appellee.

MR. JUSTICE BAUME delivered the opinion of the court.

This is a suit in assumpsit by appellee against appellant to recover damages for the breach of an alleged special contract to transport fourteen horses from Springfield to Joliet and to make connection at

Joliet with a train on the Michigan Central Railroad known as the "Horse Special," for through shipment to New York City, for the agreed rate of $170.60. The declaration alleges that appellee delivered the said horses to appellant on January 24, 1906, and that appellant then and there received the same for transportation upon the terms of said special contract, and that it then and there became the duty of appellant to have carried the said horses and to have promptly delivered the same to the Michigan Central Railroad Company so that the said horses could have been carried by said company on its said fast train known as the Horse Special; that appellant wholly disregarding its duty in that behalf did not deliver the said horses to the said Michigan Central Railroad Company so that said horses could be carried on said Horse Special to New York, whereby said horses would have reached New York on the morning of January 27, 1906, at or about 7 o'clock, but failed so to do, whereby appellee was obliged to arrange to have said horses carried to New York the best way he could, which was by inferior and slower means of transportation, and whereby said horses were delayed in transportation and did not reach New York until January 29, 1906, at or about 12 o'clock noon, and too late to be put in proper condition for exhibition and sale at the horse sale at Madison Square Gardens, as was contemplated by the parties at the time of the making of said special contract; that by reason of such delay and inferior transportation all of said horses were damaged and depreciated in value and several then became sick and one of them seriously sick, whereby said horses did not bring as much on the said market as they otherwise should and would have done; that such difference in the market price of said horses at said time and place amounted to $4,900; that in addition appellee was obliged to and did pay $29.90 in excess of the rate stipulated to be paid for the transportation of said horses under and by the terms of said special contract. Upon

a trial by jury in the Circuit Court of Sangamon county there was a verdict and judgment against appellant for $4,200.

It is first urged on behalf of appellant that the evidence does not warrant the finding of the jury, that a special contract was entered into between appellee and appellant whereby appellant undertook to deliver a shipment of horses at Joliet for transportation by the Horse Special train operated by the Michigan Central Railroad Company, and this contention is mainly predicated upon the insistence that the agent of appellant with whom appellee claims to have made the contract was without authority to make a contract binding upon appellant in that regard. The evidence introduced on behalf of appellee tends to show that the purpose of appellee to ship a lot of horses from Springfield to New York was known to one Conner, the passenger agent of appellant at Springfield, who solicited appellee to make such shipment over the railroad of appellant, and that appellee signified his willingness to do so if he could make the right arrangements; that Conner then offered to send one Eggleston, the freight agent of appellant, to interview appellee, but upon appellee's objection, based upon some reason personal to himself, to dealing with Eggleston, Conner said he would send the live stock agent of appellant to see appellee; that shortly thereafter Stuttsman, the live stock agent of appellant, called upon appellee for the purpose of inducing him to make the shipment over appellant's railroad; that appellee then told Stuttsman that he had a fine lot of high-bred horses which he had catalogued to sell at a big horse sale to be held at Madison Square Gardens, New York, and which he wanted to get there as soon as possible; that he wanted the shipment to connect at Joliet with the fast horse train operated by the Michigan Central Railroad, which train left Chicago at 3 P. M., upon certain days of the week, bound directly for New York; that Stuttsman accompanied appellee to the

office of appellant for the purpose of ascertaining the
rate to be charged and there interviewed Eggleston,
the freight agent; that Stuttsman then told Eggleston
to fix appellee out and order a car, and that appellee
said he did not want a car ordered until he had been
given a rate; that he had a rate from the Wabash and
the Illinois Central; that Stuttsman then said he would
get a rate for appellee; that upon the following day
appellee called Eggleston up by phone but was unable
to get a rate and upon the next day he again called
Eggleston up by phone, who quoted him a rate of
$170.60 to New York, whereupon he told Eggleston to
order a car; that a few days later Stuttsman said to
appellee that the latter was shipping at the right time;
that the Horse Special left Chicago, Tuesdays, Thurs-
days and Saturdays of each week, and that if appel-
lant made the shipment Wednesday night as appellee
had proposed, it would get the car to Joliet at 6 o'clock
the next morning and transfer the same to the Horse
Special, when the latter arrived at the transfer point
at about 5 o'clock in the afternoon; that appellant pro-
vided appellee with an Arms Palace Horse Car in
which appellee loaded his horses and which left
Springfield in the evening of Wednesday, January 24,
1906, and arrived at Joliet the following morning; that
the way-bill issued by appellant for the shipment bore
an indorsement as follows: "In care fast horse train
out of Chicago on M. C. Ry. about 3 P. M., Thursday,
January 25, 1906;" that when appellee went into the
office of appellant to get his shipping contract, imme-
diately before the train left Springfield, he was told by
Byers, the bill clerk of appellant, that the contract was
all made out ready for signature; that Byers passed
the same partly open through the opening in the wire
grating and indicated to appellee where he should af-
fix his signature; that appellee then asked Byers if all
arrangements had been made at Joliet for the ship-
ment and was told that the matter had been attended
to.

The evidence further tends to show that upon the arrival of appellant's train at Joliet the car containing the horses was switched upon the tracks of the Michigan Central Railroad Company; that appellant had made no arrangements for the car to be attached to the train known as the Horse Special, and for that reason or because the Michigan Central Railroad Company would not accept the transfer of a car to its said train at that place, said car was not attached to said train but was carried to New York on a meat train operated by said railroad, which train by reason of its frequent stops and slower schedule did not arrive at New York until 48 hours after the arrival of the Horse Special. It is conclusively established by the testimony of Eggleston and Stuttsman that appellee persistently insisted that the horses should be carried by appellant to Joliet to connect with the train known as the Horse Special, notwithstanding their efforts to induce appellee to permit appellant to carry the horses to Chicago and to have the car there attached to the Horse Special. We have no doubt from the evidence that appellee prevailed in his insistence upon the route of carriage designated by him and that Eggleston and Stuttsman, acting for appellant, agreed that the horses should be carried as required by appellee. The indorsement upon the way-bill and the conduct of appellant in switching the car upon the tracks of the Michigan Central Railroad Company at Joliet confirms this view. Stuttsman was employed by appellant as its live stock agent to solicit shipments of live stock over its railroad by extolling the advantages of better service and quicker connection to be obtained by shipment upon that road. The insistence of appellant that Stuttsman had no authority to make any contract with a shipper with reference to the shipment of live stock would deprive Stuttsman of the very authority which his official title and the performance of the duties imposed upon him impliedly

imported. The existence of the alleged special contract in this case, does not, however, wholly depend upon the authority of Stuttsman to make such a contract, but is based as well upon the knowledge and acquiescence of and ratification by Eggleston, the freight agent of appellant, who acted in conjunction with Stuttsman in making the arrangements with appellee for the shipment of the horses. We think the jury were fully warranted in finding that appellant by its duly authorized agent entered into a special contract with appellee as alleged in the declaration.

It is next urged by appellant that as a matter of law the contract entered into with appellee was either that signed by appellee or that implied by the law from the rate made, and was not that set out in the declaration. The paper signed by appellee as presented to him by Byers, a bill clerk in the employ of appellant, immediately before the car left Springfield was what is generally known as a "Limited Liability Live Stock Contract" or a "Uniform Live Stock Contract," which contained, among other things, an agreement on the part of the shipper that the value of each horse shipped did not exceed $100, also a release by the shipper of any and all causes of action or claims for damages that may have accrued to him by reason of any written or verbal representations made to him prior to the execution thereof, and whereby all such prior representations are declared to be merged therein, and whereby the shipper releases all claims for damages which may arise by reason of delay in transit and agrees that the live stock to be transported is not to be transported to its destination, or to be delivered to any connecting carrier within any specified time, or at any particular hour, or in season for any particular market, and that the agents of the carrier are not authorized to agree so to do.

We perceive no substantial reason why the rule last announced in Wabash R. R. Co. v. Thomas, 222 Ill.

337, that where a contract limiting the liability of a carrier is contained in a bill of lading constituting both a receipt and a contract the burden is upon the carrier to show that the shipper assented to the terms and conditions of the contract, is not as applicable in an action in assumpsit to recover damages for the breach of an alleged special contract, as in an action in tort to recover damages for negligence. In the case at bar appellee testified that he did not read the paper signed by him; that he had never read a similar paper; that he had no knowledge of its contents and that he did not assent to the restrictive provisions contained therein.

Upon its part appellant offered no substantial evidence tending to show that appellee assented to the terms of the contract signed by him, and applying the rule as above stated it must be held that the paper signed by appellee did not constitute the contract between the parties, and that appellee was not bound by the restrictive provisions therein contained. There is no proof in the record that an alternative rate was submitted to appellee, and the insistence of appellant that the contract in fact entered into was such as was necessarily implied by law from the rate made to and paid by appellee, is merely a specious endeavor to avoid the effect of the holding of the court in Wabash R. R. Co. v. Thomas, *supra,* because the contract which appellant insists is implied by law from the rate made is identical in form with that signed by appellee.

In all the cases in which it has been held that an application of the rule stated operated to relieve the shipper from the restrictive provisions of a shipping contract signed by him, the rights of the shipper and the liabilities of the carrier have been determined as fixed by the common law or statute and not by the terms of a contract which appellant insists is necessarily implied by law from the rate made in accordance with certain published tariff schedules.

It would seem to necessarily follow that if the so-called Uniform Live Stock Contract did not constitute the shipping contract between the parties, because of the failure of appellant to show that appellee assented to the restrictive provisions of such contract, and it appears from the evidence that the parties entered into an express special shipping contract as alleged in the declaration, there is no place in the case for a contract between the parties arising by implication of law based upon the rate made to appellee according to the published tariff schedules, unless it must be held that such express special contract was void as being discriminatory and *ultra vires* the appellant corporation.

Appellant introduced in evidence the joint interstate tariff rate sheets and official classification which were on file in its freight depot at Springfield at the time of making the contract of shipment here involved and which had been duly filed with the Interstate Commerce Commission and published in accordance with the rules of such commission.

According to said joint interstate tariff as so filed and published the rate from Springfield to New York on horses in carload lots was 65 cents per 100 pounds on a minimum car load weight of 20,000 pounds subject to the Uniform Live Stock Contract and the regulations contained in the tariff sheets and official classification.

In the official classification referred to appears, among other things, the following:

"1. (a) Unless otherwise provided in this classification, property will be carried at the reduced class rates specified herein, if shipped subject to the conditions of the uniform bill of lading. If consignor elects not to accept the said reduced class rates and conditions, he should so notify the agent of the forwarding carrier at the time his property is offered for shipment and if he does not give such notice it will be understood that he desires his property carried subject

to uniform bill of lading conditions in order to secure the reduced class rate thereon. Property carried not subject to the conditions of the uniform bill of lading will be at the carrier's liability, limited only as provided by the common law, by the laws of the United States and of the several states so far as they apply. Property thus carried will be charged twenty (20) per cent. higher (subject to a minimum increase of one (1) cent per one hundred pounds), than if shipped subject to the conditions of the uniform bill of lading, and the cost of marine insurance will be added over any part of the route that may be by water.

''When the consignor gives notice to the agent of the forwarding carrier that he elects not to accept the reduced class rates and conditions, but desires a carrier's liability service at the higher class rate charged for that service, the carrier must print, write or stamp upon shipping receipts and bills of lading a clause reading: 'In consideration of the higher rate charged the property herein described will be carried at the carrier's liability, limited only as provided by the common law and by the laws of the United States and of the several states, in so far as they apply.

''Agents will be expected to thoroughly familiarize themselves with the following and will take particular care to acquaint consignors or their agents with the requirements of the company before accepting live stock for shipment.

''Live stock will be taken at the reduced rates fixed in the tariff only when a uniform live stock contract is executed by the station agent and the consignor, and when the release on the back of the contract is executed by the man or men who are to accompany any said live stock. If consignor refuses to execute a uniform live stock contract, the live stock will be charged twenty (20) per cent. higher than the reduced rates specified herein; provided, that in no case shall such higher charge be less than one (1) cent per one hundred pounds.

''The rates and classification of live stock as given in this tariff are based upon the following maximum valuations: If horses or mules (including stallions or

jacks), not exceeding $100 each; if a full chartered car, on the entire contents of each car, not exceeding $1200.

"The company does not agree to transport live stock by any particular train, within any particular time, nor in time for any particular market, and agents must not give receipts containing such guarantee.

"Neither will the company be responsible for any loss or damage occurring by the refusal, failure or inability of a connecting line to receive and forward the stock after tender of delivery.

"Race horses, stallions and other high priced animals, when consignors are unwilling to have the same transported at the above list of values, will be taken only by special arrangement at one and one-half first class rates, calculated at the estimated weights named below, but agents must not accept for shipment such valuable animals without first communicating with the general or division freight agent.''

Section two of the Interstate Commerce Act prohibits a carrier from collecting a greater or less compensation for any service to be rendered than it collects from any other person for a like and contemporaneous service, and declares such discrimination to be unlawful. Section six of said act provides for the making and publication of schedules "which shall contain the classification of freight  * * *  and any rules and regulations which in any wise change, affect or determine any part or the aggregate of such aforesaid rates and fares and charges." Said section further provides for the publication of joint tariffs and for the measure of publicity to be given the same, and further provides: "And when any such common carrier shall have established and published its rates, fares and charges in compliance with the provisions of this section, it shall be unlawful for such common carrier to charge, demand, collect or receive from any person or persons a greater or less compensation for the transportation of passengers or property, or for any services in connection therewith, than is specified in such published schedule of rates, fares and charges as may at the

time be in force     *     *     *     It shall be unlawful for any common carrier, party to any joint tariff, to charge, demand, collect or receive from any person or persons a greater or less compensation for the transportation of persons or property, or for any service in connection therewith, between any points as to which a joint rate, fare or charge is named thereon than is specified in the schedule filed with the commission in force at the time." Section 8 of said Act provides civil penalties for a violation of the same, and Section 10 of the said Act provides penalties against both the carrier and the shipper and declares that any person "who shall knowingly and wilfully, by false billing, false classification, false weighing, false representation of the contents of the package, or false report of weight, or by any other device or means, whether with or without the consent or connivance of the carrier, its agent or agents, obtain transportation for such property at less than the regular rates then established and in force on the line of transportation, shall be deemed guilty of fraud, which is hereby declared to be a misdemeanor," etc.

By the amendatory Act of February 19, 1903, it is provided among other things, as follows: "It shall be unlawful for any person, persons or corporation to offer, grant or give, or to solicit, accept or receive any rebate, concession or discrimination in respect of the transportation of any property in interstate or foreign commerce by any common carrier subject to said Act to regulate commerce and the Acts amendatory thereto, whereby any such property shall by any device whatever be transported at a less rate than that named in the tariffs published and filed by such carrier, as is required by said Act to regulate commerce and the Acts amendatory thereto, or whereby any other advantage is given or discrimination is practiced.     *     *     *"

Upon a consideration of the foregoing tariff rate sheets and the several provisions of the official classification and the Interstate Commerce Act above quoted

and referred to, the position of appellant, assuming that the evidence warrants a finding that the parties made a special contract for the carriage of the horses as alleged in the declaration, concretely stated, is, that appellee must be presumed in law to have known the contents of such classification and tariffs and what service he was entitled to receive in consideration of the payment of the rate of 65 cents per 100 pounds, and that for that rate he was not entitled to contract that his stock should be carried upon any particular train, or within any particular time, or in time for any particular market, or upon a basis of a valuation in excess of $100 for each horse; that the tariff rate depends among other things upon the character of the service; that appellee not having paid a tariff rate which entitled him to any special privileges or services required by the special contract alleged in the declaration such contract was discriminatory and therefore void and that the contract being void appellee cannot obtain any redress for its breach.

In the principal cases cited and relied upon by appellant in support of its position the primary question involved related to the rate chargeable by a carrier upon an interstate shipment, and the binding effect upon the shipper and carrier alike of the rate for such shipment as fixed in the tariff schedule filed by the carrier pursuant to the Act to regulate commerce.

In Gulf, C. & S. F. R. Co. v. Hefley, 158 U. S. 98, a carrier had fixed a rate in a bill of lading for an interstate shipment, which was less than the rate established under the provisions of the Act to regulate commerce. Upon the arrival of the shipment at destination the carrier refused to deliver on tender of payment of the rate fixed in the bill of lading and demanded and collected the higher rate established by the tariff schedule. Proceedings were brought against the carrier under a statute of the State of Texas imposing a penalty upon a carrier for charging a rate in excess of that fixed in the bill of lading. A judgment of the State

Court enforcing the penalty was reversed upon the ground that the State statute as applied was repugnant to the act to regulate commerce and the court said: "The carrier cannot obey one statute without some times exposing itself to the penalties prescribed by the other.  Take the case before us:  If, in disregard of the joint tariff established by the defendant and the St. Louis & San Francisco Railway Company and filed with the Interstate Commerce Commission, the latter company, as a matter of favoritism, had issued this bill of lading at a rate less than the tariff rate, both the defendant company and its agent would by delivering the goods upon the receipt of only such reduced rate subject themselves to the penalties of the national law; while, on the other hand, if the tariff rate was insisted upon, then the corporation would become liable for the damages named in the State Act. In case of such a conflict the state law must yield."

In Texas & Pacific Ry. Co. v. Mugg, 202 U. S. 242, the agent of the railroad at the point of shipment quoted to the shipper a rate upon an interstate shipment which was less than the rate fixed in the schedule filed under the provisions of the Act to regulate commerce.  Upon the arrival of the shipment at destination, the shipper was required to pay the higher schedule rate, and in an action in the State Court a recovery was allowed of the excess collected over the rate quoted.  The judgment of the State Court was reversed and it was held that the rate fixed in the schedule filed pursuant to the Act to regulate commerce was controlling, that it was beyond the power of the carrier to depart from such rates in favor of any shipper and that the erroneous quotation of rates made by the agent of a railroad did not justify recovery, since to do so would be in effect enabling the shipper whose duty it was to ascertain the published rate to secure a preference over other shippers contrary to the Act to regulate commerce.

It will be observed that none of the restrictive pro-

visions limiting the liability of appellant as a common carrier, which are contained in the written contract signed by appellee and incorporated in the schedule filed in pursuance to the Act to regulate commerce, are to be found in the Act itself.

In C., M. & St. P. Ry. Co. v. Solan, 169 U. S. 133, it was held that a state statute providing that no contract, receipt, rule or regulation shall exempt any corporation engaged in transporting persons or property by railway from liability of a common carrier or carrier of passengers, which would exist had no contract, receipt, rule or regulation been made or entered into, was not void as an attempt to regulate interstate commerce, as applied to a contract of interstate transportation whereby the carrier attempted to limit its liability for personal injuries resulting from the negligence of its servants to the sum of $500, and the plaintiff was permitted to recover $1000 as damages for a personal injury, notwithstanding a clause in the contract which limited the liability of the carrier to a sum not exceeding $500.

In Penn. R. R. Co. v. Hughes et al., 191 U. S. 477, the defendants in error brought suit in the court of common pleas of Philadelphia against plaintiff in error to recover damages for injuries to a horse shipped by defendants in error from Albany, New York, to Cynwyd, Pennsylvania. The contract of shipment embodied in the bill of lading issued by the initial carrier provided, among other things, that neither the initial carrier nor any connecting carrier should be liable in any event for any loss or damage beyond the valuation therein fixed, as follows: "If horses or mules—not exceeding $100 each." The through rate of freight was collected by the agent of plaintiff in error at Cynwyd and was the reduced tariff rate usually charged on like shipments under bills of lading which contained the limited liability clause above recited. The horse was transported in safety to the end of the line of the initial carrier and delivered to plaintiff in error, as

the connecting carrier, and injured while the car was standing on the track of plaintiff in error in Philadelphia. A trial by jury in the Court of Common Pleas resulted in a verdict and judgment against plaintiff in error for $10,000. There was no statute in Pennsylvania prohibiting common carriers from making a contract of shipment upon the basis of an agreed valuation for the purpose of establishing a rate, but the policy and law of Pennsylvania as declared by her courts of last resort did not permit such limitations on the liability of common carriers. The judgment of the State Court was affirmed.

Referring to the several provisions of the act to regulate interstate commerce as bearing upon the question involved, the court said: "While under these provisions it may be said that Congress has made it obligatory to provide proper facilities for interstate carriage of freight, and has prevented carriers from obstructing continuous shipments on interstate lines, we look in vain for any regulations of the matter here in controversy. There is no sanction of agreements of this character limiting liability to stipulated valuations, and until Congress shall legislate upon it, is there any valid objection to the state enforcing its own regulation upon the subject, although it may to this extent indirectly affect interstate commerce contracts of carriage." "It is well settled that the state may make valid enactments in the exercise of its legislative power to promote the welfare and convenience of its citizens although in their operation they may have an effect upon interstate traffic."

The court further quoted approvingly from the opinion in C., M. & St. P. R. Co. v. Solan, *supra,* as follows: "A carrier exercising his calling within a particular state, although engaged in the business of interstate commerce, is answerable, according to the law of the state, for acts of nonfeasance or of misfeasance committed within its limits. If he fails to deliver goods to the proper consignee at the right time and

place, or if by negligence in transportation he inflicts injury upon the person of a passenger brought from another state, the right of action for the consequent damage is given by the local law. It is equally within the power of the state to prescribe the safeguards and precautions foreseen to be necessary and proper to prevent by anticipation those wrongs and injuries, which, after they have been inflicted, the state has the power to redress and to punish. The rules prescribed for the construction of railroads, and for their management and operation, designed to protect persons and property, otherwise endangered by their use, are strictly within the scope of the local law. They are not, in themselves, regulations of interstate commerce, although they control, in some degree, the conduct and the liability of those engaged in such commerce. So long as Congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the state to regulate the relative rights and duties of all persons and corporations within its limits.'' Continuing, it is said: ''It is true that this language was used of a statute of Iowa enacting a rule of obligation for common carriers in that state. But the principle recognized is that, in the absence of Congressional legislation upon the subject, a state may require a common carrier, although in the execution of a contract for interstate carriage, to use great care and diligence in the carrying of passengers and transportation of goods, and to be liable for the whole loss resulting from negligence in the discharge of its duties. We can see no difference in the application of the principle based upon the manner in which the state requires this degree of care and responsibility, whether enacted into a statute or resulting from the rules of law enforced in the state courts. The state has a right to promote the welfare and safety of those within its jurisdiction by requiring common carriers to be responsible to the full measure of the loss resulting from

their negligence, a contract to the contrary notwithstanding. This requirement in the case just cited is held not to be an unlawful attempt to regulate interstate commerce in the absence of Congressional action providing a different measure of liability when contracts, such as the one now before us, are made in relation to interstate carriage. Its pertinence to the case under consideration renders further discussion unnecessary.''

Counsel for appellant insist that the doctrine announced in the Solan and Hughes cases, *supra*, is only applicable in cases where negligence is the *gravamen* of the action but we are unable to appreciate any substantial reason for the distinction sought to be made. The language of the court in the Solan case, *supra,* heretofore quoted, as follows: ''A carrier exercising his calling within a particular state, although engaged in the business of interstate commerce, is answerable according to the law of the state, for acts of nonfeasance or of misfeasance committed within its limits. If he fails to deliver goods to the proper consignee at the right time and place, or if by negligence in transportation he inflicts injury upon the person of a passenger brought from another state, the right of action for the consequent damage is given by the local law,'' suggests that the doctrine announced is as applicable to cases involving the breach of a contract as it is to cases arising in tort.

In the case at bar the alleged special contract was entered into in this state and the alleged breach of such contract whereby damages are alleged to have accrued to appellee occured in this state. So long as the doctrine announced in Wabash R. R. Co. v. Thomas, *supra,* is adhered to it must be held in the absence of proof that a shipper assented to the restrictive provisions of a shipping contract, that the common law liability of a common carrier is not limited and that a common carrier is bound by the terms of a special contract such as is here involved. In none of the lead-

ing cases cited do we find any authority for holding that a special contract of carriage, such as is here involved, is discriminatory and void within the meaning of the act regulating interstate commerce. If the nullification by a state statute or declared law of the provision of a shipping contract limiting the extent of the liability of a carrier for loss or damage, where such contract is based upon a lower schedule rate, does not operate to render such contract discriminatory, how can it be held that a provision in a special shipping contract requiring the shipment to be transported by a particular train or within a particular time operates to render such special contract discriminatory.

It is not argued by appellant that the damages awarded to appellee are excessive.

There is no substantial error in the record and the judgment of the Circuit Court will be affirmed.

*Affirmed.*