defendant without the written consent of the magistrate who committed her being indorsed thereon, it is erroneous.

The statute is entirely plain that, where a person has been committed for vagrancy, he shall not be discharged upon the order of the commissioner unless the magistrate or court before whom the conviction was had and the commitment made shall indorse thereon his consent in writing. The superintendent or warden would violate his duty if he discharged a person so committed upon the order of the commissioner alone without the written consent of the magistrate or court. This court has held in People ex rel. Abrams v. Fox, 77 App. Div. 245, 79 N. Y. Supp. 56, that such provision of the law requiring the consent to discharge of the committing magistrate was constitutional, and it is manifestly a wholesome one. The various committing magistrates of the city have to deal with an enormous number of persons guilty of such acts as to make them vagrants. The statute compels all vagrants to be sentenced for a definite period of six months. Some no doubt ought to serve the full period and others possibly a much less term of imprisonment. The magistrate must necessarily know more respecting these persons than the commissioner of corrections or the wardens of the various institutions to which they are committed. The law, therefore, very wisely provides that, in case of conviction and commitment for vagrancy, the question of discharge before the expiration of the six months shall be submitted to the committing magistrate or court for his or its approval, which approval shall be evidenced by his written consent indorsed upon the order which the commissioner of corrections is directed by law to make.

While the relator was entitled to have the defendant commissioner make an order in her behalf and such an order as the facts permitted, she was not entitled to be discharged upon that order without the approval of the magistrate or court which convicted and committed her. The defendant commissioner should make his order and transmit it to the superintendent or warden of the institution, and the relator can then, if she be able, procure the written consent to her discharge of the magistrate before whom she was convicted. If he consents, she may then be released according to the provisions of the order, but, if he refuses, she must serve her full term of commitment.

The order appealed from should be modified by striking out that portion above quoted, and, as so modified, affirmed. All concur.

---

NEW YORK CENT. & H. R. R. CO. v. SMITH.

(Supreme Court, Special Term, Putnam County. March 8, 1909.)

CARRIERS (§ 192*)—UNDERCHARGES FOR FREIGHT.

Where a shipper, pursuant to a contract with a station agent, paid freight on shipments at a rate less than the tariff rate fixed by the carrier in the schedule posted and filed with the public service commission, as required by Public Service Commission Act (Laws 1907, p. 905, c. 429) § 28, the carrier may recover from the shipper the difference between such rates.

[Ed. Note.—For other case, see Carriers, Dec. Dig. § 192.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Action by the New York Central & Hudson River Railroad Company against John Smith. Heard on motion to set aside verdict for defendant, and for a new trial. Motion granted.

Alexander S. Lyman, for plaintiff.

J. Bennet Southard, for defendant.

TOMPKINS, J.   The plaintiff's freight agent agreed with the defendant to carry milk in cans and bottles on the plaintiff's railroad from Carmel to Melrose Junction, both in the state of New York, at a rate less than the tariff rate fixed by the schedule filed by the plaintiff with the public service commission, and posted as required by section 28 of the public service commission act. Laws 1907, p. 905, c. 429. The tariff was paid, and this action was brought to recover the difference between the amount of freight paid by the defendant under the said arrangement with the plaintiff's agent and the tariff rate shown by the schedule filed with the public service commission, and posted as aforesaid.

At the trial a verdict for the defendant was directed, and a motion was thereupon made to set aside the verdict and for a new trial, upon which decision was reserved, and the question on this motion is whether the contract made by the plaintiff's agent with the defendant for a rate less than the legal charge as fixed by the schedule filed with the public service commission is a valid contract as far as the parties thereto are concerned, and whether the plaintiff is bound thereby. At the trial, I was of the opinion that the plaintiff was estopped from making any claim in excess of the rate fixed and agreed upon by its agent with the defendant, but the authorities bearing upon the question seem to hold the other way. My attention has not been called to any decision in this state, nor have I been able to find one, on this question, as far as it relates to state commerce or the public service act of this state; but there have been decisions by the federal courts as to the validity and effect of such a contract under the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), and by such decisions it has been uniformly held that a contract between a common carrier and a shipper for a freight rate less than the tariff rate as fixed by the filed schedule is not only in violation of the interstate commerce act and illegal, but that neither party thereto can avail himself of its terms, and that neither party to such a contract is protected thereby. Armour Packing Co. v. United States (decided by United States Supreme Court on March 16, 1908) 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681.

In Texas & Pacific Railway v. Mugg, 202 U. S. 244, 26 Sup. Ct. 628, 50 L. Ed. 1011, the railroad company made and quoted to Mugg a rate of $1.25 per ton on two cars of coal, and $1.50 per ton on one car of coal in January and February, 1903, respectively, from Coal Hill, Ark., to Weatherford, Tex., on which rates so made and quoted plaintiff relied in contracting said coal shipped and sold at prices based on said rates; whereas, defendant assessed and collected of plaintiff freight at the rate of $2.75 per ton on said two cars, and $2.85 per ton on said one car, which said freight rate plaintiff was forced to pay, and

did pay under protest, in order to obtain said coal and deliver the same in compliance with sales previously made, and sued to recover back the excess. The rates of $1.25 and $1.60 per ton were shown in the bill of lading under which the property was transported, while the rates collected were the rates shown in the carriers' tariffs on file with the interstate commerce commission, when the property moved. The carrier contended that, if it ever quoted any such rate as claimed by plaintiff, such quotation was a violation of the interstate commerce act, and that the contract relied upon by the plaintiff, if made, was in violation of law, and void.

Mr. Justice White, delivering the opinion of the court, says:

"This case is within the principle of and is ruled by the decision in Railroad Company v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910. Upon the authority of that case, the Supreme Court of Alabama denied the liability of a railroad company in a case of similar character to that under review. Southern Railroad Co. v. Harrison, 119 Ala. 539, 24 South. 552, 43 L. R. A. 385, 72 Am. St. Rep. 936. The opinion of Chief Justice Brickell so aptly reviewed and declared the effect of the decision in the Hefley Case that we adopt the same in disposing of the present controversy. The Alabama Court said: 'In Gulf, etc., Railroad Co. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910, the plaintiff sued to recover damages for the refusal by the carrier to deliver goods consigned to him after tender of payment of the stipulated charges named in the bill of lading. The goods, a lot of furniture, had been received by the carrier at St. Louis, Mo., for transportation to Cameron, Tex., at a stipulated rate, specified in the bill of lading, of 69 cents per 100 pounds, the charges amounting to $82.80, whereas the published schedule rate in force at the time was 84 cents, and the charges should have been $100.80, and the plaintiff, as in this case, was ignorant of the fact that the rate obtained was less than the schedule rate. It was held, in an opinion by Brewer, J., that the plaintiff was not entitled to recover. It is true that the only question discussed in the opinion was whether or not the interstate act superseded the Texas statute, which prohibited a common carrier from charging or collecting from the owner or consignee of freight a greater sum that that specified in the bill of lading, and this question was decided in the affirmative. * * * But this was not the only effect of the decision, and it is by its effect on the rights of the parties to such a contract, by whatever process of reasoning the decision may be reached, that the state courts are bound. The clear effect of the decision was to declare that one who has obtained from a common carrier transportation of goods from the state to another at a rate specified in the bill of lading less than the published schedule rates filed with and approved by the Interstate Commerce Commission, and in force at the time, whether or not he knew that the rate obtained was less than the schedule rate, is not entitled to recover the goods, or damages for their detention, upon the tender of payment of the amount of charges named in the bill of lading, or of any sum less than the schedule charges. In other words that, whatever may be the rate agreed upon, the carrier's lien on the goods is, by force of the act of Congress, for the amount fixed by the published schedule of rates and charges, and this lien can be discharged, and the consignee can become entitled to the goods, only by the payment or tender of payment of such amount. Such is now the supreme law, and by it this and the courts of all other states are bound. * * *'"

The two cases above cited were under the interstate commerce act, which so far as the filing and publishing of freight rates is concerned is very similar to the public service law of this state. Section 6 of the interstate commerce act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3156 as amended by Act June 29, 1906, c. 3591, § 2, 34 Stat. 586, U. S. Comp. St. Supp. 1907, p. 895]) provides:

"That every common carrier subject to the provisions of this act shall file with the commission created by this act, and print and keep open to public

inspection schedules showing all the rates, fares, and charges for transporta·
tion between different points on its own route and between points on its own
route, and points on the route of any other carrier by railroad, by pipe line,
or by water when a through route and joint rate have been established. If no
joint rate over the through route has been established, the several carriers in
such through route shall file, print and keep open to public inspection, as afore-
said, the separately established rates, fares and charges applied to the through
transportation. The schedule printed as aforesaid by any such common car-
rier shall plainly state the places between which property and passengers will
be carried, and shall contain the classification of freight in force, and shall al-
so state separately all terminal charges, storage charges, icing charges, and
all other charges which the commission may require, all privileges or facilities
granted or allowed and any rules or regulations which in any wise change,
affect or determine any part or the aggregate of such aforesaid rates, fares,
and charges, or the value of the service rendered to the passenger, shipper,
and consignee. Such schedule shall be plainly printed in large type, and copies
for the use of the public shall be kept posted in two public and conspicuous
places in every depot, station or office of such carrier where passengers or
freight, respectively, are received for transportation, in such form that they
shall be accessible to the public and can be conveniently inspected. The pro-
visions of this section shall apply to all traffic, transportation and facilities
defined in this act."

"No carrier, unless otherwise provided by this act, shall engage or partici-
pate in the transportation of passengers or property, as defined in this act, un-
less the rates, fares, and charges upon which the same are transported by
said carrier have been filed and published in accordance with the provisions of
this act. Nor shall any carrier charge, or demand or collect, or receive a
greater or less or different compensation for such transportation of passengers
or property, or for any service in connection therewith, between the points
named in such tariffs than the rates, fares, and charges which are specified
in the tariff filed, and in effect at the time; nor shall any carrier refund or re-
mit in any manner or by any device any portion of the rates, fares and charges
so specified, nor extend to any shipper or person any privileges or facilities in
the transportation of passengers or property, except such as are specified in
such tariffs."

Section 28 of the public service law (Laws 1907, p. 905, c. 429) of
this state reads as follows:

"Every common carrier shall file with the commission having jurisdiction,
and shall print and keep open to public inspection schedules showing the rates,
fares and charges for the transportation of passengers, and property within
the state between each point upon its route and all other points thereon; and
between each point on its route and all points upon every route leased, operat-
ed or controlled by it; and between each point on its route or upon any route
leased, operated or controlled by it and all points upon the route of any other
common carrier, whenever a through route and joint rate shall have been es-
tablished, or ordered between any two such points. If no joint rate over a
through route has been established, the several carriers in such through route
shall file, print and keep open to public inspection, as aforesaid, the separately
established rates, fares and charges applied, to the through transportation.
The schedules printed as aforesaid, shall plainly state the places between
which property and passengers will be carried, and shall also contain the
classification of passengers, freight or property in force, and shall also state
separately all terminal charges, storage charges, icing charges and all other
charges which the commission may require to be stated, all privileges or
facilities granted or allowed, and any rules or regulations which may in any
wise change, affect or determine any part, or the aggregate of, such afore-
said rates, fares and charges, or the value of the service rendered to the pas-
senger, shipper òr consignee. Such schedules shall be plainly printed in large
type, copies thereof for the use of the public shall be kept posted in two pub-
lic and conspicuous places in every depot, station and office of every common

carrier, where passengers or property are received for transportation, in such manner as to be readily accessible to and conveniently inspected by the public. The form of every such schedule shall be prescribed by the commission, and shall conform as nearly as possible to the form of schedule required by the Interstate Commerce Commission, under the act of Congress, entitled, 'An act to regulate commerce,' approved February 4th, 1887, as amended by act approved June 29th, 1906, and other amendments thereto. Where any similar schedule is required by law to be filed with both commissions, they shall agree upon an identical form for such schedule. The commission shall have power from time to time, in its discretion, to determine and prescribe by order such changes in the form of such schedule as may be found expedient."

The provisions of the two acts being so nearly alike, the reasoning and conclusions of the federal courts respecting the interstate commerce law apply with equal force to the public service act of this state. Besides, the Appellate Division of the Supreme Court of the First Department in the very recent case of Baltimore & Ohio R. R. Co. v. La Due, 128 App. Div. 594, 112 N. Y. Supp. 964, held that the effect of the federal legislation regulating interstate commerce is to remove the question of rate from the realm of private agreement. Says the opinion in that case:

"Every contract of carriage by a common carrier engaged in interstate commerce must as a matter of law be at the rate fixed and established as provided by the statute, and no agreement as to the rate to be charged is valid or enforcible if it varies in any degree from the rate thus fixed and established. Texas & Pacific Railway v. Alibene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553; Gulf, Colorado, etc., Ry. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910; Texas & Pacific Ry. v. Mugg, 202 U. S. 242, 26 Sup. Ct. 628, 50 L. Ed. 1011; Armour Packing Co. v. United States, 209 U. S. 56, 28 Sup. Ct. 428, 52 L. Ed. 681. The carrier is entitled to receive, and the shipper is required to pay, the rates fixed. No more can lawfully be demanded. No less can lawfully be accepted. In an action, therefore, to recover excess charges, it is wholly immaterial whether or not any special agreement was made as to rates. If the rate charged corresponded with the established schedule, it was lawfully charged. If it did not so correspond, it was unlawfully charged, and the excess may be recovered. The question in each case is whether or not more was charged than the amounts specified in the established schedule. A defendant seeking an affirmative judgment by way of counterclaim must allege and prove all the essential facts to sustain his claim precisely as if he were plaintiff. Applying these rules to the present case, it will be seen that the defendants neither alleged nor proved the necessary facts to entitle them to recover. They alleged a special contract as to the rate to be charged, but that was immaterial. In order to recover, they should have alleged and proved that the rate charged was in excess, not of the special rate agreed to, but of the appropriate rate established as required by law."

And, while this decision of the Appellate Division relates to contracts and shipments under the interstate commerce law, yet, inasmuch as the public service law of this state contains practically the same provisions respecting the fixing of freight rates and the filing and posting of tariff schedules for state commerce, that decision must be held to be controlling in a case under the state law and decisive of the case at bar.

My decision, therefore, is that the contract between the plaintiff and defendant for a freight rate less than the tariff rate fixed by the schedule, filed and posted under the public service act, was and is illegal, and does not protect the defendant, or bind the plaintiff, and

that the plaintiff is entitled to recover the difference between the rate fixed by the filed and posted schedule and the amount paid under the said illegal agreement.

The motion to set aside the verdict and for a new trial is granted.