CHICAGO, B. & Q. RY. CO. v. FRYE BRUHN CO.

(Circuit Court of Appeals, Eighth Circuit. October 11, 1910. On Petition for Rehearing, January 17, 1911.)

No. 2,965.

1. APPEAL AND ERROR (§ 248*)—RECORD—NECESSITY OF EXCEPTIONS.

In the federal courts an exception, taken immediately on a ruling being made, is indispensable to a review of the ruling by an appellate court.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1432, 1435; Dec. Dig. § 248.*]

2. CARRIERS (§ 223*)—CONTRACT FOR CARRIAGE OF LIVE STOCK—ACTION FOR BREACH—DEFENSES.

Where a railroad company contracted to carry cattle, to be shipped from a quarantined district in Texas, from Kansas City to Seattle, at a stated rate per car, it cannot avoid liability for the damages caused by its breach of the contract, by its refusal to receive the cattle at Kansas City, on the ground that it was without facilities for transporting them under the conditions required by law with respect to cattle from a quarantined district.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 223.*]

3. COMMERCE (§ 52*)—INTERSTATE COMMERCE—POWER OF CONGRESS TO REGULATE—SHIPMENT OF CATTLE FROM QUARANTINE DISTRICT.

The provisions of Orders Nos. 106 and 107 of the Secretary of Agriculture, promulgated March 10 and 13, 1903, respectively, under authority of Act Feb. 2, 1903, c. 349, §§ 1, 2, 32 Stat. 791, 792 (U. S. Comp. St. Supp. 1909, pp. 1183, 1184), establishing quarantine districts for cattle and regulations to be observed by carriers in the shipment of cattle from such districts, and which provide (Order No. 107, § 4) that "cattle from said area may be transported by boat or rail for immediate slaughter" subject to such regulations, have the force of law and are paramount with respect to interstate shipments; and Code Wash. 1896, §§ 3216, 6431, which prohibit the introduction of Texas cattle into the state, so far as they conflict with such federal regulations, are void.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 48-52; Dec. Dig. § 52.*]

4. APPEAL AND ERROR (§ 1008*)—MATTERS REVIEWABLE—ACTION TRIED TO COURT.

Where a jury is waived in an action at law in a federal court, the findings of fact made by the trial court are not reviewable on error by the Circuit Court of Appeals.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3955-3969; Dec. Dig. § 1008.*]

In Error to the Circuit Court of the United States for the Eastern District of Missouri.

Action by the Frye-Bruhn Company against the Chicago, Burlington & Quincy Railway Company. Judgment for the plaintiff, and defendant brings error. Affirmed.

Edward S. Robert (James E. Kelby, on the brief, and Robert & Robert and William L. Becktold, of counsel) for plaintiff in error.

Arthur B. Shepley (Daniel N. Kirby, on the brief, and Nagel & Kirby, of counsel), for defendant in error.

Before SANBORN and HOOK, Circuit Judges, and REED, District Judge.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

REED, District Judge. The Frye-Bruhn Company, a Washington corporation (which will be called the "plaintiff"), sued the Chicago, Burlington & Quincy Railway Company, an Iowa corporation (which will be called the "defendant"), to recover from it as a common carrier and forwarder of freight and property from Kansas City, Mo., destined to Seattle, Wash., damages because of its refusal to receive from the Missouri, Kansas & Texas Railway Company (which will be called the "M., K. & T. Co."), at said Kansas City, 21 carloads of cattle, aggregating 508 head, owned by the plaintiff and shipped by it from points near Lorena, Tex., over the M., K. & T. Co., consigned to itself at Seattle. For answer the defendant alleged, among other things, that when the cattle were offered to it by the M., K. & T. Co. at Kansas City they were infested with cattle "tick," which communicates splenetic or Texas fever to cattle not immune from such disease, and were brought to Kansas City by the M., K. & T. Co. from points in Texas within a quarantined district or area established by the Board of Animal Industry of the Department of Agriculture of the United States as authorized by a law of Congress, and in violation of that law and of the regulations of said Board of Animal Industry made pursuant thereto; that defendant had no separate pens or facilities for handling or caring for cattle so infested to be transported to Washington points, as required by the laws of the United States, and was not a common carrier of such cattle from Kansas City to points in Washington, or other far Western points; and that it refused for such reasons to receive or transport such cattle. It further answered that its alleged agreement to carry the cattle at $240 per car was less than its published rate, required by the acts of Congress, for carrying cattle in interstate commerce, and was, therefore, void. A jury was waived in writing, and the cause tried to the court, which resulted in a judgment for the plaintiff, and the defendant brings error.

The court made special findings of facts, upon which it based its judgment against the defendant, which in substance are:

That plaintiff in 1903 was engaged in the business of buying and slaughtering cattle and packing meat at Seattle, in the state of Washington; that the defendant was at such time a common carrier of cattle and other property from Kansas City, Mo., through connecting lines, to points in the state of Washington, and that its lines connected with the M., K. & T. Co., at Kansas City, Mo.; that in the latter part of April, 1903, the plaintiff sent its cattle buyer, one Kennedy, to Lorena, Tex., with instructions to purchase for it a lot of cattle at that and nearby places, provided he could get a rate of $240 per car for transporting them to Seattle; that, upon his arrival at Lorena, Kennedy took up the question of shipping the cattle with the M., K. & T. Co., which operated its line of road from that vicinity to Kansas City; that telegraphic communications then ensued between the proper officers of the defendant company and the M., K. & T. Co., whereby it was finally arranged that a rate of $240 per 36-foot car was given by the defendant to the plaintiff for the transportation of some 22 carloads of cattle from Lorena, Tex., by the M., K. & T. Co. to Kansas City, where they were to be delivered to the defendant, and it was to transport them through its connecting lines to Seattle;

that the M., K. & T. Co. was to have $55 of the agreed rate per car for transporting the cattle to Kansas City, and the defendant the remainder for transporting them to Seattle; that pursuant to such arrangement Kennedy on May 6th delivered to the M., K. & T. Co., at stations on its line near Lorena, 21 carloads of cattle consigned to plaintiff at Seattle at a through rate of $240 per 36-foot car, upon bills of lading which provided that the M., K. & T. Co. should carry the cattle to Kansas City and there deliver them to the defendant as its connecting carrier, and across the face of each was stamped the words "Southern Cattle, Subject to Quarantine Regulations." The cattle were intended for immediate slaughter at Seattle, their destination, were shipped as such by plaintiff, and the M., K. & T. Co. was advised to that effect. The cattle arrived at Kansas City on May 8th, were unloaded by the M., K. & T. Co. into quarantine pens, and on the following day tendered to the defendant for forwarding, and their transportation demanded by the M., K. & T. Co. and by plaintiff's agent Kennedy; but defendant refused to receive or transport them. As the result of defendant's refusal, the cattle remained in the quarantine pens in Kansas City until May 15th, when they were sold for plaintiff's account, and at a loss to it of the amount for which the judgment was rendered.

Upon the arrival of the cattle in Kansas City, more than half of them were actually infested with the Texas cattle tick; that the disease known as Texas fever is communicated solely by the bite of such tick, which, however, can travel but a few feet; that cattle from an infected area are immune from the disease, and their meat is healthy; but the disease, if contracted by Northern cattle which have never had it, is almost always fatal; that the fact that these cattle were actually infested with ticks was learned by defendant through an examination made by the United States inspector on May 11th; that defendant had no separate quarantine pens at Kansas City, in which to unload the cattle for food, water, and rest; that at and prior to the date in question defendant regularly received at, and transported from, Kansas City cattle which had been shipped to that place from the quarantine area, consigned to Chicago, Omaha, and St. Louis, but did not so receive or transport them if consigned to Seattle or other Western points. Order No. 107 of the Board of Animal Industry is set out in the findings, from which it appears that Lorena and nearby stations in Texas are within the quarantine district or area described in said order, and that cattle are not to be shipped by any railroad company from such quarantine district, except under certain conditions, which the court found were not complied with by plaintiff's agent, Kennedy, nor by the M., K. & T. Co., in the shipment of these cattle from Texas to Kansas City.

The eighth paragraph of the court's findings reads as follows:

"(8) Lorena, Temple, and Taylor, Tex., from where the cattle were shipped, are south of the quarantine line described in order No. 107 of the Board of Animal Industry of the United States and amendments thereto, and within the area designated by said order in which cattle were infected with the disease known as splenetic or Texas fever. This fact was known to defendant at the time it solicited this shipment from the M., K. & T. Co. There was no

provision made by the government authorities for inspection of cattle coming from these points, and no government inspection could have been had."

The defendant contends in argument that paragraph 8 and others of the findings of fact are without any support in the testimony; also that the court erred in all of its findings of fact, and in refusing to find certain facts, and declare the law as requested by it. But we are precluded from considering or determining any of these questions, for the record before us fails to show that any exceptions were taken to any of the findings, or to the refusal to find the. facts, or declare the law, as the defendant claims to have requested. The judgment was rendered June 16, 1908, and the findings of fact filed on that date. On September 18th following the defendant filed its petition for a writ of error, together with an assignment of errors, as required by the rules of this court. In the assignment of errors then filed the defendant states that it excepted to paragraph No. 8 of the findings of fact as being without any support in the testimony, and that other findings were contrary to the testimony of the plaintiff; that defendant requested the court to find certain facts and make certain declarations of law, which it refused to do; and that it duly excepted to such refusal at the time thereof. These statements so made are without support in the record; for, aside from the assignment of errors, it nowhere appears that defendant requested the court to find any fact, make any declaration of law, that it refused to do so, or that defendant excepted to any such refusal. The office of an exception, in practice, is to challenge the correctness of any ruling made by the trial court during the progress of the trial, to the end that it may be corrected by the court itself, if, upon its attention being called thereto, it deems it to be erroneous, and to lay the foundation for its review, if necessary, by the proper appellate tribunal. In the courts of the United States such an exception, taken immediately upon the ruling being made, is indispensable to a review of the ruling by the appellate court. Railway Co. v. Heck, 102 U. S. 120, 26 L. Ed. 58; Newport News, etc., Ry. Co. v. Pace, 158 U. S. 36, 37, 15 Sup. Ct. 743, 39 L. Ed. 887; Potter v. United States, 58 C. C. A. 231, 122 Fed. 49, 55. There might be difficulty in finding in the bill of exceptions sufficient evidence to support the eighth paragraph, and perhaps others, of the findings of fact, if we were at liberty to review the evidence upon which they are based; but for the reasons stated we are precluded from so doing.

It is not disputed that the facts as found warrant a judgment against the defendant; but it is contended that it should have been allowed to offset against the damages found for plaintiff the full amount of its published rate of $240 per car for transporting cattle from Kansas City to Seattle, instead of $185, for which it had agreed to transport them, and which the trial court found was the reasonable cost of such transportation. This contention is upon the theory that defendant's agreement to transport the cattle for $185 per car was in effect an agreement for a rebate, therefore a violation of the interstate commerce law, and void, and that, notwithstanding such agreement, it is entitled to recover the full published rate for transporting the cattle. The difficulty with this contention is that defendant did

not transport the cattle, but refused to do so. It is not, therefore, entitled to recover anything for their transportation, and no question of an unlawful rebate is involved. The court, in finding the value of the cattle in Seattle, fixed $185 per car as the reasonable cost of transporting them from Kansas City. There is no evidence that this was not the reasonable cost of their transportation; nor is there any evidence or finding as to what defendant's published rate per car, or otherwise, was for the transportation of cattle from Kansas City to Seattle, or the joint rate from Texas common points to Seattle. There is testimony tending to show that the rate at which defendant agreed to carry the cattle would have gone into effect in three days, if it had been filed with the Interstate Commerce Commission, and would have been a legal rate. If defendant had filed such rate, or caused it to be filed by the M., K. & T. Co., it would have been one for which the plaintiff could have legally procured the transportation of its cattle from Kansas City to Seattle, and therefore the reasonable cost of the transportation.

It is further contended that the laws of Montana, Wyoming, and Washington, through which it would be necessary for the defendant to carry the cattle to their destination, forbade under heavy penalties the transportation through such states of cattle from a quarantined area, except upon certain conditions with which it was unable to comply, and that it was, therefore, justified in refusing to receive them. But if defendant solicited their shipment, knowing the cattle were from the quarantined area, as found by the court, and agreed to transport them to Seattle through said states, it was its duty to be prepared to comply with the conditions upon which it might lawfully carry them, and it cannot justify its refusal to accept them for such carriage upon the ground that it was not prepared to comply with such conditions.

The conclusion therefore is that the judgment must be affirmed; and it is accordingly so ordered.

Affirmed.

## On Petition for Rehearing.

The defendant has presented a petition for rehearing in which it is alleged, among other things, that the court has mistakenly assumed in the opinion filed that the law of Washington permitted the importation of the cattle in question into that state upon certain conditions with which the defendant might have complied. The part of the opinion in which the alleged mistake occurs reads in this way:

"But if it [the defendant] solicited their shipment, knowing the cattle were from the quarantined area, as found by the court, and agreed to transport them to Seattle through said states, it was its duty to be prepared to comply with the conditions upon which it might lawfully carry them, and it cannot justify its refusal to accept them for such carriage upon the ground that it was not prepared to comply with such conditions."

In their original brief counsel for defendant say:

"The states through which the Burlington and Northern Pacific Railroads ran forbade the carriage of cattle when unaccompanied by a bill of health, and when the road had no quarantine pens."

And sections of the statutes of Missouri, Nebraska, Wyoming, Montana, and sections 3216–3219 and 6431 of the Washington Code (1896) are cited in support of the statement. This impliedly admits that if a "bill of health" so-called, had accompanied the cattle, or if the roads had had the requisite quarantine pens in which to unload the cattle during transit, they might under the state laws have lawfully carried them to their destination, and the state statutes cited were not specifically noticed in the opinion. It is still admitted, as we understand counsel for defendant, that the laws of each of these states, except Washington, conform substantially to the rules and regulations of the Department of Agriculture, made pursuant to the laws of Congress concerning the interstate transportation of Southern cattle, and that the cattle in question might lawfully have been carried into or through those states upon complying with such laws and regulations. In the petition for rehearing section 6431 of the Code of Washington (1896) is set out for the first time, as follows:

"Any person or persons introducing or bringing into said state any Texas cattle, or cattle infected with the Texas cattle disease, or Spanish fever, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be imprisoned in the county jail for a term not exceeding 12 months, or fined in a sum not less than $5,000, or be both fined and imprisoned, in the discretion of the Court."

And section 3216 reads:

"The introduction of Texas cattle or cattle infected with what is known as the Texas cattle disease or splenetic fever, into the state of Washington is hereby prohibited."

It is the contention of the defendant that these sections do not conflict with any law of the United States and forbade, under the penalty prescribed, its carriage of them into the state of Washington and justified its refusal to receive them; and Reid v. Colorado, 187 U. S. 137, 23 Sup. Ct. 92, 47 L. Ed. 108, is cited in support thereof. We are unable to assent to this. The sections quoted from the Washington Code are in no sense an inspection law, or other proper police regulation, but by their terms exclude absolutely from the state of Washington all Texas cattle, though they may be entirely free from disease of any kind. The sections were enacted in 1869, and are so broad as to fall, apparently, within the class of legislation condemned by the Supreme Court in Hannibal & St. J. Ry. Co. v. Husen, 95 U. S. 465, 24 L. Ed. 527, and later cases in which the rule there announced is reaffirmed. Whether or not these sections might be upheld in part, as suggested by counsel for defendant, we need not stop to inquire; for, if not repealed or modified by later acts, they must, upon the enactment by Congress of laws within its rightful power to enact, and with which they conflict, yield to the congressional act.

In 1895 the Legislature of Washington passed an act creating the office of State Veterinarian, and empowered him to establish quarantine against contagious and infectious diseases, and, with the concurrence of the Governor of the state, make the necessary rules and regulations with respect thereto, and for this purpose he and the Governor were authorized to co-operate with the government of the United States in enforcing any law of Congress for the prevention

and spread of such diseases in that state. Chapter 167, Laws Wash. 1895, incorporated as sections 4653–4657 in the Code of Washington (Pierce's Code 1905 [sections 3050–3054, Ballinger's Ann. Codes & St.]). It is quite probable that this act was passed in response to an invitation extended by the Secretary of Agriculture to the executive authority of the state of Washington, pursuant to section 3, c. 60, of the act of Congress of May 29, 1884 (23 Stat. 32); and presumably the State Veterinarian and Governor of Washington have performed the duties required of them by this law, established the quarantine, and promulgated the requisite rules and regulations necessary for their co-operation with the Department of Agriculture of the United States in the enforcement of proper quarantine regulations for the prevention and spread of such diseases in the state of Washington. Counsel have not seen fit to furnish us with a copy of such quarantine order and the rules promulgated by the state officers pursuant to that act, if any. We are justified in assuming that, if any were adopted, they do not conflict with the law of Congress and the rules and regulations established by the Secretary of Agriculture pursuant thereto. But however this may be, we are of the opinion that chapter 60 of the act of Congress of May 29, 1884, above authorizes the interstate shipment of cattle to market for slaughter, though they may be infected with the disease known as splenetic or Texas fever. Section 6 of that act contains a proviso as follows:

"Provided that the so-called splenetic or Texas fever shall not be considered a contagious, infectious or communicable disease within the meaning of this act, as to cattle being transported by rail to market for slaughter when the same are unloaded only to be fed and watered in lots on the way thereto."

After the decision in the case of Reid v. Colorado, and obviously in view of that decision, Congress by its act of February 2, 1903 (32 Stat. 791 [U. S. Comp. St. Supp. 1909, p. 1183]), conferred upon the Secretary of Agriculture larger power, to be exercised exclusively by him, over the interstate movement of cattle infected with, or which have been exposed to, contagious, infectious, or communicable diseases. By sections 1 and 2, c. 349, of that act the Secretary of Agriculture is authorized and directed to establish from time to time such rules and regulations as he shall deem necessary concerning the interstate shipment of live stock, from any place within the United States into or through any other state or territory, which he may have reason to believe are infected with any infectious, contagious, or communicable diseases, and to take such measures as he may deem proper to prevent the introduction or dissemination of such diseases from one state or territory to another, whenever in his judgment such action is advisable, to guard against the spread of such contagion; and all such rules and regulations shall have the force of law. It is also provided that whenever an inspector of the Bureau of Animal Industry shall issue a certificate stating that he has inspected any cattle or other live stock which are about to be driven or transported from one state or territory to another, and has found them free from splenetic or Texas fever infection, or any other infectious, contagious, or communicable disease, such animals so inspected and cer-

tified may be driven or transported from such place into or through any other state or territory without further inspection, except such as may be at any time ordered by the Secretary of Agriculture; and all such animals shall at all times be under the control and supervision of the Bureau of Animal Industry for the purpose of such inspection.

Pursuant to this authority the Secretary of Agriculture on March 10 and 13, 1903, promulgated Orders Nos. 106 and 107, respectively, establishing a quarantine line and regulations to be observed by the carrier in the interstate shipment of cattle from an infected state or area, and gave public notice thereof, as directed by the act, to transportation companies, stockmen, and others, and that the disease known as splenetic, Southern, or Texas fever existed among cattle in a designated area, which included the state of Texas. Section 4 of Order No. 107 provides "that cattle from said area may be transported by rail or boat for immediate slaughter," and when so transported certain regulations must be observed, among which are that when any cattle in course of transportation from said area are unloaded above —north, east, or west of—the line so established, for food or water, or for other purposes, said cattle shall be placed in yards or pens set apart for infected cattle, and no other cattle shall be admitted thereto. The kind of pens into which the cattle shall be unloaded during transit and upon arrival at their destination is designated, and the observance is directed of all local applicable sanitary regulations prescribed by the proper officer of the state where they are unloaded.

It is true that Order No. 107 as amended March 14, 1903, so far as it adopted a quarantine line established by a state which was wholly within such state and not along its borders, was held invalid by the Supreme Court as to the portion of such line wholly within such state, because it was applicable to intrastate as well as the interstate shipments of cattle. Railroad Co. v. McKendree, 203 U. S. 514, 27 Sup. Ct. 153, 51 L. Ed. 298. But it is not claimed that this affects the regulations to be observed during the transportation from one state to another and upon the arrival of the cattle at their destination.

The cattle in question were shipped from Texas for immediate slaughter upon their arrival at Seattle, and the Missouri, Kansas & Texas Company was so advised at the time of their shipment. The laws of Congress and the orders of the Secretary of Agriculture made pursuant thereto are controlling, and sections 3216 and 6431 of the Code of Washington (1896), as above quoted, if in force at the time of that shipment, are in direct conflict therewith, and must yield to them. Gulf, etc., Ry. Co. v. Hefley, 158 U. S. 98–102, 103, 15 Sup. Ct. 802, 39 L. Ed. 910; Asbell v. Kansas, 209 U. S. 251–257, 258, 28 Sup. Ct. 485, 52 L. Ed. 778.

Whether or not the defendant might rightly have refused to receive the cattle, if it had not joined with the Missouri, Kansas & Texas Company in the agreement with plaintiff for their transportation to Seattle, we need not determine, for it joined in that agreement prior to their shipment from Texas. After it so agreed and the Missouri, Kansas & Texas Company had performed its part of the agree-

ment by carrying the cattle to Kansas City, the defendant could not then refuse to receive them "because it had no separate pens in which to unload them during transit," the sole ground of its refusal to receive them, without incurring a legal liability for such refusal. We are therefore of the opinion that the defendant cannot escape legal responsibility for refusing to transport the cattle because it did not have the requisite pens "in which it could unload them during transit."

It is also, alleged that the opinion mistakenly says, "Nor is there any *evidence* or finding as to what defendant's published rate per car or otherwise was for the transportation of cattle from Kansas City to Seattle, or the joint rate from Texas common points to Seattle;" for, it is said, there is such evidence. Whether so or not the facts as found by the trial court are what control. Rev. St. U. S. §§ 649, 700 (U. S. Comp. St. 1901, pp. 525, 570); Martinton v. Fairbanks, 112 U. S. 670, 5 Sup. Ct. 321, 28 L. Ed. 862; The City of New York, 147 U. S. 72, 13 Sup. Ct. 211, 37 L. Ed. 84; Lehnen v. Dickson, 148 U. S. 71–72, 13 Sup. Ct. 481, 37 L. Ed. 373; U. S. Fidelity & Guaranty Co. v. Board of Com'rs, 145 Fed. 144–151, 76 C. C. A. 114. The trial court found that:

"Prior to May 10, 1903, the defendant had in effect a filed and published rate from Lorena and other Texas points to Seattle."

The rate is not stated, but the finding obviously refers to the joint rate agreed upon between the defendant and the Missouri, Kansas & Texas Company, which was filed with the Interstate Commerce Commission, to cover the shipment of plaintiff's cattle to Seattle. The cattle were tendered to the defendant in Kansas City on May 9th. On that date the rate, according to the finding, was in effect, and the cost to plaintiff for transporting them from Kansas City to Seattle would then have been $185 per car, the defendant's share of the agreed rate, as the court found.

The petition for rehearing is denied.